**Frederick PLUMMER, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 04–CF–857.

District of Columbia Court of Appeals.

Argued March 11, 2008
and Jan. 15, 2009.

Decided Nov. 12, 2009.

Shilpa S. Satoskar and Alice Wang, Public Defender Service, with whom, James Klein, Samia Fam, Andrea Roth and Jacklyn Frankfurt, were on the briefs, for appellant.

Elizabeth H. Danello and Roy W. McLeese III, Assistant United States Attorneys, with whom, Jeffrey A. Taylor, United States Attorney at the time the briefs were filed, and Elizabeth Trosman, and Wendy L. Short, Assistant United States Attorneys, were on the briefs, for appellee.

Before REID, GLICKMAN, and KRAMER, Associate Judges.

REID, Associate Judge:

Frederick Plummer, the appellant, challenges his convictions on the lesser-included charge of carrying a pistol without a license ("CPWL"), and the offense of possession of an unregistered firearm ("UF"), in violation of D.C.Code § 7–502.01.[1] He asserts that the police seized him for Fourth Amendment purposes when they drew their weapons and ordered him to turn around and put his hands up, and hence, since the police did not have reasonable, articulable suspicion to stop him, the trial court erred by denying his Motion to Suppress Evidence and Statements. We conclude that Mr. Plummer was not seized when the police approached him with their guns drawn and ordered him to put up his hands because he did not comply with that show of authority. Furthermore, at the time he was seized after complying with the order to put up his hands, the police had suitable corroboration showing reliability that Mr. Plummer was the person identified in an anonymous 911 call as carrying a gun, and that because of his repeated movements to his waist where guns are commonly concealed, the police had suitable corroboration demonstrating reliability that Mr. Plummer was engaged in the criminal act of carrying a gun. Consequently, the police had reasonable, articulable suspicion to stop Mr. Plummer, and the trial court properly denied Mr. Plummer's motion to suppress.

After the Supreme Court handed down its decision in *District of Columbia v. Heller,* —— U.S. ——, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) in late June 2008, we ordered supplemental briefing and oral argument on Mr. Plummer's contention that his conviction must be reversed under *Heller* because the District of Columbia statutes under which he was convicted violate his Second Amendment individual right to bear arms. We conclude that Mr. Plummer had standing to challenge his convictions under the Second Amendment. We further hold that the UF and CPWL statutes are not facially invalid. However, for the reasons stated in this opinion, we are constrained to remand this case to the trial court with instructions to hold a hearing to

---

1. Count one of the indictment charged Mr. Plummer with carrying a pistol without a license (Outside One's Home . . . .), in violation of D.C.Code § 22–4504(a) (2001). The jury found him not guilty of that offense.

determine whether Mr. Plummer would have satisfied the statutory requirements in D.C.Code § 7–2502.03 pertaining to qualifications for obtaining a registration certificate.

## FACTUAL SUMMARY

At the hearing on Mr. Plummer's motion to suppress, the government presented the testimony of Metropolitan Police Department ("MPD") Officer Sayvon Weinfeld. As a result of a 911 call, Officer Weinfeld and his partner, Officer James Rogers, were dispatched to 2813 4th Street, in the Northeast quadrant of the District of Columbia, on the evening of October 20, 2003. The 911 caller had indicated that "a black male in a blue work uniform" had a gun. When the officers arrived at the designated address, they "observed [a man later identified as Mr. Plummer] standing in front of the address that was given by the dispatcher and banging on the door." He was wearing "a blue button-down type shirt and dark blue Dickey style work pants." [2]

The officers "exited [their] vehicle, approached [Mr. Plummer and] started ordering him to put his hands up." Mr. Plummer "began reaching towards his waist several times in a motion [that] appeared as if he was attempting to pull something out of his pants, out of his waistband." The officers "[c]ontinued to order him to put his hands up." After the officers gave the order "several times, he eventually complied and put his hands up." "Officer Rogers approached [Mr. Plummer] and handcuffed him for [the officers'] safety," but Mr. Plummer was not arrested at that point. Officer Weinfeld explained that there were safety concerns "[b]ecause the initial call was for a man with a gun

and the individual that [the officers] had stopped . . . was reaching towards his waist [and][i]t's a common place for an individual . . . [who] possess[es] a handgun to keep it on [his] person." Even after he was handcuffed in front of the premises at 2813, Mr. Plummer "kept moving his hands behind him, attempting to reach to his right side . . . ."

After Mr. Plummer was handcuffed, the door to 2813 4th Street opened and a man emerged. The officers ordered the man to put his hands up because they "weren't sure what was going on." The officers decided to separate Mr. Plummer and the man who opened the door. Officer Rogers went over to the man from the house while Officer Weinfeld "walk[ed] [Mr. Plummer] away from the front of the house" and turned him over to two other officers, Ewald and Groves, who had arrived on the scene. These officers "pull[ed] [Mr. Plummer] further away from the house."

Officer Rogers spoke with the man from the house, later determined to be the 911 caller; the man asserted that Mr. Plummer had banged on his door earlier and had a bottle of wine. When the complainant refused to agree to drink with him, Mr. Plummer "began splashing the wine on the door and then left the location." Later, Mr. Plummer returned with his shirt unbuttoned and outside of his pants; the first time he had appeared at the door, Mr. Plummer's shirt had been "buttoned up and tucked into his pants." The complainant "could see through the open shirt what he believed to be a silver handgun . . . with a pearl handle."

As the two officers, Officers Ewald and Groves, pulled Mr. Plummer away from 2813, Officer Weinfeld heard Officer Ewald

---

**2.** When the trial judge inquired as to whether Mr. Plummer was wearing "a full-body uniform," Officer Weinfeld responded that

"Dickey-style" is "a brand name" and the work pants are designed to be more durable and they are "thick pants."

state: "He's got something in his pocket." Later, Officer Ewald informed Officer Weinfeld "that she had patted [Mr. Plummer's] pocket and immediately recognized that he had ... a pistol or a gun in his pocket." The officers "secured [Mr. Plummer] on the ground", and "Officer Groves retrieved a .32 caliber semiautomatic pistol from his right pocket." [3] Mr. Plummer was arrested on a charge of carrying a pistol without a license.

On cross-examination, Officer Weinfeld stated that it took him "[s]omewhere between a minute and two minutes to get to 2813 4th Street after receiving the dispatch; that upon his arrival in the 2800 block of 4th Street, no one else was on that block"; when he and Officer Rogers saw Mr. Plummer knocking on the door of 2813, Mr. Plummer's back was to the officers and the officers were about fifteen to eighteen feet away from him; and Mr. Plummer "made the movements [to his waist] after [the officers] had beg[u]n to give orders for him to put his hands up." Defense counsel asked Officer Weinfeld, "And after you commanded him to put his hands up and turn around, what did he do, sir?" Officer Weinfeld responded, "Began pulling at his waist." After demonstrating how Mr. Plummer was pulling at his waist, defense counsel inquired, "When he made that movement, was he facing you or was his back toward you?" Officer Weinfeld answered, "He was facing us"; the officer did not see a gun. In response to defense counsel's question, "How many times did you have to ask him to put his hands up

before he did so?" Officer Weinfeld stated, "I don't know the exact amount of times. We repeated ourselves several times." Officer Weinfeld also indicated that the officers had their guns drawn, and that the officers did not find a gun upon checking Mr. Plummer's waist area.[4]

The trial court denied the motion to suppress the tangible evidence stating, in part:

> Here the officer saw the defendant, who matched the description of a man with a gun. The description was for a black male wearing a blue work uniform at an identified address. The defendant was the only person in the block, the only person at that address, and he was wearing what the witness described as a blue work outfit. He was at that address.
>
> I believe it was reasonable for [the officers] to do what they did in order to determine whether in fact [the defendant] had a gun to assure their safety and the safety of others in the community, and that was to try to make certain he could not harm anyone by directing him to put his hands up. They made several commands for him to do that before there was any compliance. And indeed, before he did comply, he made several movements to his waist area that the police officer described.

In reaching its conclusion, the trial court examined the Supreme Court's decision in

---

**3.** Although Officer Weinfeld testified that after advising Mr. Plummer of his rights, he had asked him "where he got the gun from," the prosecutor announced that the government did not intend to use Mr. Plummer's statements responding to the officer's question.

**4.** During the course of Officer Weinfeld's cross-examination, when defense counsel began to focus on where Officer Weinfeld went

after Officers Ewald and Groves moved Mr. Plummer away from 2813, the trial court interrupted indicating that the questions were "not particularly relevant" to issues that needed to be resolved during the motions hearing. The trial judge also commented, "I would find that Mr. Plummer was seized at the time the police drew their guns on him."

*Florida v. J.L.,*[5] and the court continued:

I think the noncompliance with the commands increased their concern for their safety and distinguishes this case from ... *Florida v. J.L.....*

But I think the most significant factor besides the quick response [of the officers to the lookout dispatch] and the corroboration of the innocent details was the defendant's behavior once they encountered him and ... his noncompliance to their repeated commands raised their suspicion and allowed them to handcuff him to conduct a *Terry* frisk, and the fact that they placed him on the ground does not convert this to an arrest. I believe he was seized even though he did not willingly comply, but police are allowed to transport *Terry* suspects great distances. Here they placed him on the ground and the police officer testified that a colleague felt the outside of his pocket and felt what she believed to be a firearm, and they were justified in going inside his pocket and recovering that firearm.

And it's noteworthy that within minutes, if not seconds, the complainant told the police that Mr. Plummer was the person he had phoned about who had the gun.

The government presented only two witnesses at trial, Officer Weinfeld and Officer Ewald. Officer Weinfeld's trial testimony concerning the evening of the incident was consistent with his testimony during the hearing on Mr. Plummer's motion to suppress. Officer Ewald stated that around 8:22 p.m. on October 20, 2003, she and Officer Groves "received a 911 call for a man with a gun [in] the 2800 block of 4th Street, Northeast." They arrived on the scene within "two minutes or less." Officer Ewald saw Officers Weinfeld and Rogers in front of 2813 4th Street with a man in handcuffs. They "w[ere] securing" the man, and Officer Ewald "ran ... to assist [them]" because the man "kept turning and trying to reach his hands—even though his hands were in handcuffs, he kept turning and trying to reach his hands into his front right pocket."[6] Officers Ewald and Groves moved Mr. Plummer away from the top of the steps in front of 2813 4th Street and as they were moving him, he "again tried to reach his hands around and was twisting his torso and trying to reach ... into his front right pocket." "Because of his movements[,][t]hey were very furtive towards his pocket," she "placed [her] hand on the outside of his pocket and felt to see if there was any kind of weapon inside his pocket." She "felt very clearly the outline of a handgun inside his pocket[,] looked down ... [inside his pocket where she saw] a shiny silver handle, and it appeared to be the handle of a handgun...." She said to Officer Groves, "he has a gun in his pocket." They "walked [Mr. Plummer] down to the sidewalk[,] ... place[d][him] on the ground ... [a]nd Officer Groves went into his front right pocket and pulled the hand gun out and secured it a few feet away." Officer Ewald walked about "20 feet" away from 2813 4th Street to the place where Mr. Plummer lived, "looked around the front door to see if there was any type of weap-

---

**5.** 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). That case involved an anonymous tip and the issue of whether the defendant was "seized" under the Fourth Amendment.

**6.** As Officer Ewald described the man's actions, the trial judge indicated what she was doing: "And the witness has her hands behind her back and is trying to reach into [her] right pocket with [her] hands behind the back, twisting her torso to do that."

on or any type of ammunition there, but [she] didn't observe any."

Mr. Plummer was a witness for the defense.[7] He testified that he worked for a company that repairs televisions, VCRs and other equipment. On October 20, 2003, he lived at 2811 4th Street, Northeast, which had two units or two apartments, and he occupied the bottom unit. The premises at 2811 and 2813 are "connected together." On the evening of October 20, 2003, Mr. Plummer drove home from work and parked his car in the rear of his unit, off of an alley. As he was "in the process of unloading [his] toolbox and . . . two [televisions]" that he had picked up for repair, he "found a revolver on the ground on the passenger side [of his car]." He did not own a gun and he had never seen the one on the ground. He picked up the revolver and noticed that it did not have any bullets. He carried one television into his home and "stuck the gun in his pocket after [he] got inside [his] house." He intended to take the gun to the police station; he did not call the police, even though he had a cell phone, because he planned to go out again and "drop [the gun] off at the police station." He decided to go to the mailbox in front of his home, and when he turned away from the mailbox, he "saw two officers walking towards [him] with their gun[s] out." They were not pointing their guns at Mr. Plummer; "[t]hey had [them] down at their side." He was "startled" and "scared" and the officers "told [him] to put [his] hands up." He put his hands up and did not reach towards his waist; an officer handcuffed him, and he did not struggle while he was being led away. One officer searched him and found the gun that he had picked up.

The government presented one rebuttal witness, Officer Weinfeld. After refreshing his recollection with notes he made on the evening of Mr. Plummer's arrest, he testified that after Mr. Plummer had been properly warned about his rights, he was asked whether the gun was his. He replied that "it was his girlfriend's gun." Later, Mr. Plummer "stated just spontaneously, 'that's not my gun.'"

The trial court's charge to the jury included the elements of "carrying a pistol without a license outside one's home":

> One, that the defendant carried a pistol, openly or concealed, on or about his person.
>
> Two, that he carried the pistol knowingly and intentionally. . . .
>
> Three, that the pistol was operable, that is, that it would fire a bullet.
>
> Four, that the defendant was not licensed to carry the pistol by the chief of police of the District of Columbia.
>
> And five, that the defendant carried the pistol in a place other than his home, place of business, or land or premises possessed and controlled by him.

The trial judge also told the jury that, as to the lesser-included offense of carrying a pistol without a license, the elements included the first four elements of the greater offense, but not the fifth element. With respect to the charge of possession of an unregistered firearm, the trial court stated the following elements:

> One, that the defendant possessed the firearm.
>
> Two, that he did so knowingly and intentionally. . . .

**7.** Mr. Plummer acknowledged that he had been convicted in the District, in 1997, of misdemeanor destruction of property.

Three, that the firearm had not been registered to him, as required by D.C. law.

In addition, the court charged the jury on the concept of "innocent possession":

You have heard evidence through the defense that Mr. Plummer found the gun in question in the alley behind his apartment building and that he picked up the gun to secure it and that he intended to take the gun to the police.

Innocent possession of a gun is a complete defense to the charges of carrying a pistol without a license and possession of an unregistered firearm. A defendant is in innocent possession of a firearm if he had both the intent to turn the weapon over to the police and he was pursuing that intent with immediacy and through a reasonable course of conduct.

It is the government's burden to prove that the defendant was not in innocent possession of the firearm. If you find that the government has not disproved innocent possession of the firearm, then you must find Mr. Plummer not guilty.

## ANALYSIS

### The Motion to Suppress

Mr. Plummer argues that the trial court erred by denying his motion to suppress. He claims he "was 'seized' for the purposes of the Fourth Amendment when uniformed officers exited their marked police cruiser, approached him, drew their weapons, and ordered him to turn around and put his hands up." The government contends that the "[t]rial court properly denied appellant's suppression motion[,][but] disagree[s] with the court's conclusion that [Mr. Plummer] was 'seized' as soon as the police drew their weapons." The government maintains that Mr. Plummer "did not submit at that point to the police show of authority, and thus, . . . he was not yet seized." Mr. Plummer replies that he "was seized, when he stopped and turned to face the officers."

■■■ "In reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Shelton v. United States*, 929 A.2d 420, 423 (D.C.2007) (internal quotations marks and citation omitted). "In particular, we must give deference to the trial court's findings of fact as to the circumstances surrounding the appellant's encounter with the police and uphold them unless they are clearly erroneous." *Id.* (internal quotation marks and citation omitted). However, we review *de novo* the trial court's legal conclusions as to whether and when a seizure occurs, *Jackson v. United States*, 805 A.2d 979, 985 (D.C. 2002), and whether the seizure was based on facts sufficient to justify a *Terry* stop, *Milline v. United States*, 856 A.2d 616, 618 (D.C.2004).

■■■ "The Fourth Amendment of the Constitution protects individuals from unreasonable seizures by governmental authorities." *Jackson, supra,* 805 A.2d at 983. "Generally, any restraint of a person amounting to a seizure is invalid unless justified by probable cause." *Id.* (internal quotation marks and citation omitted). However, "[t]he police may conduct an investigatory stop on less than probable cause provided that, under the totality of the circumstances, the police officer could reasonably believe that criminal activity was afoot." *Id.* (internal quotation marks and citation omitted). "To justify an investigative stop, the police 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Nixon v. United States*, 870 A.2d 100, 103 (D.C.2005) (quoting *Ter-*

*ry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

"Where there is a challenge to an improper *Terry* stop, the threshold question is whether [and when] a seizure ... occurred." *See Jackson, supra*, 805 A.2d at 983; *United States v. Barnes*, 496 A.2d 1040, 1042 (D.C.1985). "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement...." *Brendlin v. California*, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) (citations and internal quotation marks omitted). "A police officer may make a seizure by show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Id.* (citing *California v. Hodari D.*, 499 U.S. 621, 626 n. 2, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)) (other citation omitted); *see also Davis v. United States*, 781 A.2d 729, 739 (D.C.2001); *Green v. United States*, 662 A.2d 1388, 1390 (D.C.1995). " '[S]ubmission' under *Hodari D.* requires, at minimum, that a suspect manifest compliance with police orders." *United States v. Waterman*, 569 F.3d 144, 146 n. 3 (3d Cir.2009) (citations omitted); *see also United States v. Swindle*, 407 F.3d 562, 568 (2d Cir.2005) ("*Hodari D.* Strongly implies—without explicitly holding—that an unreasonable order to stop does not violate the Fourth Amendment and that the grounds for a stop may be based on events that occur after the order to stop is given.") (citing *Hodari D., supra*, 499 U.S. at 629, 111 S.Ct. 1547); *United States v. Johnson*, 341 U.S.App. D.C. 289, 293–94, 212 F.3d 1313, 1316–17 (2000) ("Under ... *Hodari D.* ..., a seizure requires the ap-

plication of physical force or submission to an assertion of authority.").

Furthermore, " 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity, ...' [but] there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.' " *J.L., supra*, 529 U.S. at 270, 120 S.Ct. 1375 (quoting *Alabama v. White*, 496 U.S. 325, 329, 327, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). A tip may provide "predictive information" that is sufficiently reliable "to identify a determinate person," but the tip must also be "reliable in its assertion of illegality." *Id.* at 271–72, 120 S.Ct. 1375 (referencing 4 W. LaFave, *Search and Seizure* § 9.4(h) (3d ed.1996)).

Mr. Plummer insists that he "was 'seized' for the purposes of the Fourth Amendment when uniformed officers exited their marked police cruiser, approached him, drew their weapons, and ordered him to turn around and put his hands up." A virtually identical argument was made in *Waterman, supra*. The pertinent facts of that case, as determined by the District court and summarized by the Third Circuit, follow:

> [Two police officers] responded to a dispatcher's report that an anonymous informant had observed a "subject" with a gun at 1009 West Seventh Street in Wilmington, Delaware. The dispatcher did not indicate the tip's reliability. [The officers] responded to the call in a marked police vehicle. As [they] proceeded down West Seventh Street, they observed the silhouettes of five people standing on the front porch of a house. Turning on the spotlight, [one officer] confirmed that the address of the house was 1009, and that two females and three males were on the porch. [Defen-

dant] was standing in the middle of the group, near the front door of the residence. Getting out of the police cruiser, [one officer] ... positioned herself 8–10 feet from the residence, while [the other officer] approached the house. [The officer] did not observe any weapons but ordered the individuals on the porch to place their hands in the air for safety reasons. All complied except [defendant], who kept his hands in his jacket pockets.

569 F.3d at 144–45. The officers "drew their firearms as [one of them] repeatedly commanded defendant to put his hands in the air. Defendant did not comply; he moved one of his hands behind his back and turned the doorknob of the front door, [but] the door didn't open[,] ... and [one officer] continued, unsuccessfully, to order defendant to show his hands." *Id.* at 145. Subsequently, someone opened the door to exit and defendant entered. *Id.* The District Court in *Waterman* "concluded that [defendant] was effectively 'stopped' when [one officer] commanded everyone on the porch to put their hands in the air." *Id.* The Third Circuit disagreed, determining that "there was no application of physical force," *id.* at 146, and that while there was a "show of authority" and "a display of force" by the police, "it fell short of the physical force required under *Hodari D.*, *id.* at 146 (footnote omitted), and further", "there was no submission by [defendant]," *id.* Consequently, it "reverse[d] the Order

of the District Court suppressing the evidence...." *Id.*

In a District of Columbia Circuit case, *Johnson, supra,* the court also examined actions, including "shoving down" motions, made by defendant after police officers drew their guns and ordered him to raise his hands. The court declared, "we do not think the seizure took place immediately after [defendant's] first 'shoving down' motion, when [a police officer] drew his gun and ordered [defendant] to raise his hands." *Johnson,* 341 U.S.App. D.C. at 292, 212 F.3d at 1316. The court explained:

> Under ... *Hodari D., [supra ]*, a seizure requires the application of physical force or submission to an assertion of authority. Before [defendant] raised his hands, [the police officer] had made a show of authority but [defendant] had not submitted to it. On the contrary, he continued to make "shoving down" motions, gestures that were the very opposite of complying with [the officer's] order, and which a reasonable officer could have thought were actually suggestive of hiding (or retrieving) a gun, In sum, by the time the stop actually took place, it was supported by [defendant's] continued furtive gestures in response to being confronted by a police officer, and that was suspicious enough to support a reasonable belief that [defendant] may have been engaged in criminal activity.

*Id.* at 341 U.S.App.D.C. at 292–93, 212 F.3d at 1316–17. *Waterman* and *Johnson* are instructive.[8]

---

**8.** *Waterman* and *Johnson* are distinguishable from another Second Circuit case, *United States v. Simmons,* 560 F.3d 98 (2d Cir.2009). The Second Circuit distinguished *Simmons* from *Hodari D., supra,* and *Swindle, supra.* In *Simmons,* an anonymous 911 caller reported an assault in progress at a specified address, and officers were dispatched to that address. Upon their arrival at that address, "located in a neighborhood that has a prob-

lem with drugs, shots fired, and ... a gang presence," the officers "saw a group of people outside the apartment building and asked whether 'anyone was being beaten up.' " 560 F.3d at 101. The response was "no," and the police " 'did not see anyone being assaulted' and 'did not see evidence' that an assault had occurred." *Id.* The officers entered the apartment building and appellant "began walking toward them with his hands in his jacket

■ Although an anonymous tip was involved in the case before us, we conclude that under the totality of the circumstances, *J.L.* does not control the outcome of this case. Unlike *J.L.*, Mr. Plummer's case is not one where the police conducted a *Terry* stop and frisk "on the basis of [a] bare-boned tip[ ]", *J.L.*, 529 U.S. at 273, 120 S.Ct. 1375, about a young Black male carrying a gun at a public bus stop. In contrast with *J.L.*, the anonymous tip in Mr. Plummer's case contained "predictive information" which, "suitably corroborated, exhibit[ed] sufficient indicia of reliability [of the identity of 'a determinate person'] to provide reasonable suspicion' " that the man at the door of 2813 4th Street, Northeast was the same one mentioned in the anonymous telephone tip. *J.L.*, *supra*, 529 U.S. at 271, 120 S.Ct. 1375. When the officers arrived in the 2800 block of 4th Street within one to two minutes after receiving the dispatch, as predicted by the tipster, they saw a man standing in front of the exact location mentioned in the tip. The man, who was the only person on the block, was banging on the door of 2813 and he was dressed in blue work clothes, as predicted by the tipster. Reliability of identity, however, is not sufficient under

*J.L.*; the tip must be reliable in its assertion of illegality. *Id.* at 272, 120 S.Ct. 1375. Hence, the police officers who stopped Mr. Plummer had to have seen something that confirmed the presence of a gun prior to his seizure.

Under our *de novo* review of the legal question of seizure in this case, we must view the facts in favor of sustaining the trial court's ruling denying Mr. Plummer's motion to suppress, and we must defer to the trial court's factual findings. *Shelton, supra*, 929 A.2d at 423. Upon seeing the man at the door of 2813, according to the testimony of Officer Weinfeld, the police "started ordering him to put his hands up." [9] He did not comply and the officers repeated the order "several times." As the trial court found, the officers "made several commands ['directing Mr. Plummer to put his hands up'] before there was any compliance. And indeed, before he did comply; he made several movements to his waist area...." Those movements instilled safety concerns in the officers because, as Officer Weinfeld explained, the lookout call was for a man with a gun and the man at the door of 2813 "was reaching

pockets"; one officer "ordered [appellant] to 'hold on a second' but [appellant] continued walking." *Id.* The officer "again ordered [appellant] to 'hold on a second,' and [appellant] stopped." *Id.* The officer then instructed appellant twice to take his hands out of his pockets but he did not comply either time; the officer "then 'grabbed over to' [appellant's] right side where he 'felt the butt of a gun....' " *Id.* The court found that in contrast to cases like *Hodari D.* and *Swindle*, "[t]he facts of [*Simmons*] ... involve an *order* to *stop*, compliance with that *order*, and a 'seizure' at the moment [appellant] complied with the *order*." 560 F.3d at 106–07 (footnote omitted and emphasis supplied). Here, unlike *Simmons*, Officer Weinfeld testified that he and Officer Rogers ordered Mr. Plummer "to put his hands up" several times before he complied. While a cross-examination question suggested that the officers might also had

said, "turn around," that was neither the factual finding nor the primary order issued in this case. Notably, in explaining her decision to deny the motion to suppress the trial judge stated, in part, "I believe it was reasonable for [the officers] to do what they did in order to determine whether [appellant] in fact had a gun to assure their safety and the safety of others in the community, and that was to try to make certain he could not harm anyone by directing him to put his hands up."

9. We do not agree with Mr. Plummer that he was seized "when he stopped and turned to face the officers." There was no submission to authority at that point because Mr. Plummer failed to obey the command and to raise his hands despite the police order, repeated several times, to put them up.

toward his waist[,] . . . a common place for an individual . . . [who] possess[es] a handgun to keep it on [his] person." The testimony shows and the trial court's factual findings reveal that the police did not apply force to Mr. Plummer before he made the movements to his waist, and even though the police ordered him several times to put his hands up, he failed to comply, and hence, he did not submit to authority and was not seized at that time since "[a] police officer may make a show of authority without the use of physical force, but there is no seizure without actual submission." *Brendlin, supra,* 551 U.S. at 254, 127 S.Ct. 2400 (citing *Hodari D., supra,* 499 U.S. at 626 n. 2, 111 S.Ct. 1547) (other citation omitted); *see also Waterman,* 569 F.3d at 146 n. 3.

As in the factually similar case of *Waterman, supra,* the officers had their guns drawn and repeatedly ordered the appellant to put his hands up, but he did not comply, and in *Waterman,* the court concluded "there was 'no submission.' " 569 F.3d at 146. Under the totality of the circumstances of this case, then, we hold that the police had "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed][the] intrusion" of an investigative stop. *Nixon, supra,* 870 A.2d at 103. Consequently, although the trial court initially incorrectly stated that Mr. Plummer "was seized at the time the police drew

their guns on him," its denial of the motion to suppress was proper.[10] Indeed, the trial court subsequently declared that Mr. Plummer's "noncompliance to [the officers'] repeated commands" "to put his hands up" was a "significant factor" in the officers' justifiable behavior under the Fourth Amendment. *See Brendlin,* 551 U.S. at 254, 127 S.Ct. 2400 ("there is no seizure without actual submission"); *see also Waterman, supra; Johnson, supra.*

### The Second Amendment Issue

On February 10, 2004, years before the Supreme Court's decision in *Heller,* Mr. Plummer filed a motion to dismiss the indictment against him on Second Amendment grounds. The trial court relied on then existing case law in this jurisdiction and summarily denied the motion on February 20, 2004.

Mr. Plummer renewed his Second Amendment contention on appeal. In his supplemental brief, he contends that "because the application of the firearm registration and licensing statutes to [his] conduct infringed his core Second Amendment right to possess and carry a pistol in his home, his convictions are unlawful and must be reversed." In the alternative, he asserts that because the District's "firearm registration and licensing statutes under which he was prosecuted formed an unconstitutional ban on the possession and car-

---

**10.** Mr. Plummer relies heavily upon *Williamson v. United States,* 607 A.2d 471 (D.C.1992) (per curiam). That case was decided prior to the Supreme Court's 2007 decision in *Brendlin,* but is consistent with our approach in Mr. Plummer's case. We believe that Mr. Plummer misreads *Williamson* with respect to the issue of an individual's submission to a show of authority. *Williamson* consisted of a very short per curiam opinion and three separate opinions by the panel members. All three panel members agreed, however, that the police officer's "direction to the car to stop, *complied with by the driver* and accom-

panied almost simultaneously by the officer's command to the occupants to raise their hands, was a seizure of the vehicle and its occupants." *Id.* at 473 and n. 7 (emphasis supplied). The submission to authority in *Williamson,* for the purpose of Fourth Amendment seizure analysis, occurred when the automobile stopped in response to the order of the police, whereas in this case, the submission to authority did not take place until after the police had ordered Mr. Plummer to put his hands up several times, and after he had made movements to his waistband.

rying of pistols by ordinary citizens", those statutes are "facially invalid" and they "are void and unenforceable," "either because the District's interest in eliminating handguns is illegitimate, or because the total ban is not narrowly tailored to serve the District's legitimate interest in reducing handgun violence."[11] In addition, he states, "[t]he District's total ban on the possession and carrying of handguns is likewise facially invalid under the overbreadth doctrine[,]" and "even if the statutes could be saved by a legitimate narrowing construction, ... [they] could not be retroactively applied to [him] because of due process considerations."

The government argues that, under *Heller*, the District's statutes which make it unlawful to carry a pistol without a license and a firearm without registering it are neither facially invalid, nor invalid as applied to Mr. Plummer. The government contends that "a statute that is unconstitutional in some respects is not normally invalid in all respects, and such statutes typically may lawfully be applied to other settings in which they are constitutionally valid." Moreover, the government maintains, case law reveals that "the overbreadth doctrine is limited to the First Amendment context." The government disputes Mr. Plummer's claim that "he was convicted for possessing a firearm in his home." Instead, the government states, "he was convicted for carrying a pistol *without a license* and for possessing an *unregistered* firearm." (Emphasis supplied.) The government further argues that *Heller* "did not authorize [Mr.] Heller

or others to immediately possess or carry firearms without complying with licensing and registration requirements," but the Court "directed the District of Columbia to administer those requirements in a manner consistent with the Second Amendment," and "[t]he current record does not indicate whether [Mr. Plummer] could actually have met those requirements." According to the government, Mr. Heller "unlawfully defied licensing and registration requirements, by carrying a pistol without obtaining a license or registration, and for that reason his conduct is not protected by the Second Amendment."

In reply, Mr. Plummer takes issue with the government's approach to the case with respect to the Second Amendment issue. He argues that this is not a case involving a lawful licensing scheme that is merely improperly administered. Instead, it concerns a licensing scheme that is itself unconstitutional, whether on its face or as applied to the litigant. Thus, he maintains, he was not "require[d] ... to challenge the denial of a license through administrative and judicial review before engaging in unlicensed activity"; rather, he could "engage in constitutionally protected activity without a license and then challenge the constitutionality of the licensing scheme as a defense to a criminal prosecution."

We begin with a summary of what the Court decided and did not decide in *Heller, supra*. The Court concluded that the "Second Amendment [to the Constitution] conferred an individual right to keep and bear arms."[12] 128 S.Ct. at 2799. This

---

11. Mr. Plummer specifically identifies D.C.Code § 7–2502.01 (prohibiting possession of an unregistered firearm), § 7–2502.02(a)(4) (prohibiting registration of pistols except for a narrow class of persons), D.C.Code § 22–4504(a) (carrying a pistol without a license), and 24 DCMR § 2304.15, *repealed by* 56 D.C.Reg. 4380 (2009) (providing that licenses

to carry a pistol may be issued only to those having registered pistols).

12. In his majority opinion, Justice Scalia traced the historical origins of the Second Amendment right and asserted that: "By the time of the founding, the right to have arms had become fundamental for English sub-

right extends to having a handgun in the home "to 'keep' and use for protection of one's home and family"; hence, the District's total ban on "handgun possession in the home" for the "lawful purpose" of "self-defense," family defense and one's property "fail[s] constitutional muster." *Id.* at 2817–18. The Court specifically "h[e]ld that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 2821–22. Consequently, said the Court, "[a]ssuming that [Mr.] Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home." *Id.* at 2822; *see also Howerton v. United States,* 964 A.2d 1282, 1287–88 (D.C.2009); *Sims v. United States,* 963 A.2d 147, 150 (D.C.2008).

However, the Court also declared that the Second Amendment right is not absolute, that it "is not unlimited," *id.* at 2816; it does not "protect the right of citizens to carry arms for *any sort* of confrontation . . .", *id.* at 2799; nor is it "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 2816 (citation omitted). Moreover, historically, "prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.* (citations omitted). The Court asserted that "nothing in [its] opinion should be taken to cast doubt on long-standing prohibitions on the possession of

firearms by felons and the mentally ill, or laws forbidding the carrying of firearms *in* sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 2816–17. Although the Court "[did] not address the [District's] licensing requirement," it noted that the District "stated that 'if the handgun ban is struck down and respondent registers a handgun, he could obtain a license, assuming he is not otherwise disqualified' "; and the Court also pointed out that [Mr. Heller] "conceded at oral argument that he does not 'have a problem with . . . licensing' and that the District's law is permissible so long as it is 'not enforced in an arbitrary and capricious manner.' " *Id.* at 2819.

■■■ We next set forth the version of the District's statutes under which Mr. Plummer was arrested and which he challenges in this case. D.C.Code § 7–2502.01(a) (2001) specified, in pertinent part: "Except as otherwise provided . . ., no person . . . in the District shall possess or control any firearm, unless the person . . . holds a valid registration certificate for the firearm"; subsection (a) also delineated the type of organization and the law enforcement officials to whom a registration certificate could be issued; and Section 7–2502.01(b) contained exceptions to the general prohibition of subsection (a), but none of these exceptions applied to an ordinary resident of the District who wished to possess a handgun in his or her home for defensive use.[13] In addition,

---

jects," and that "Blackstone . . . cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen." 128 S.Ct. at 2798 (citing 1 *Blackstone* 136, 139–40 (1765)) (other citations omitted).

**13.** In 2009, the Council of the District of Columbia amended subsection (b) by adding a

new subsection (4). D.C.Code § 7–2502.01(b) now reads:

(b) Subsection (a) of this section shall not apply to:

(1) Any law enforcement officer or agent of the District or the United States, or any law enforcement officer or agent of the government of any state or subdivision thereof, or

D.C.Code § 7–2502.02(a)(4) precluded the issuance of a registration certificate for a "[p]istol not validly registered to the current registrant in the District prior to September 24, 1976, except" as specified; the exception clause did not pertain to an ordinary citizen who desired to register a handgun for purposes of defense in the home.[14] And, D.C.Code § 7–2502.03(a) contained restrictions on the issuance of a registration certificate, including those based on age (between eighteen and twenty-one), criminal history, mental health history, prior adjudication for firearm negligence, and vision.

D.C.Code § 22–4504(a) (2001) provided:[15]

(a) No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed. Whoever violates this section shall be punished as provided in § 22–4515, except that:

(1) A person who violates this section by carrying a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon, in a place other than the person's dwelling place, place of business, or on other land possessed by the person, shall be fined not more than $5,000 or imprisoned for not more than 5 years, or both; or

(2) If the violation of this section occurs after a person has been convicted in the District of Columbia of a violation of this section or of a felony, either in the District of Columbia or another jurisdiction, the person shall be fined not more than $10,000 or imprisoned for not more than 10 years, or both.

Regulations at issue in this case were

any member of the armed forces of the United States, the National Guard or organized reserves, when such officer, agent, or member is authorized to possess such a firearm or device while on duty in the performance of official authorized functions; (2) Any person holding a dealer's license; provided, that the firearm or destructive device is: (A) Acquired by such person in the normal conduct of business; (B) Kept at the place described in the dealer's license; and (C) Not kept for such person's private use or protection, or for the protection of his business; (3) With respect to firearms, any nonresident of the District participating in any lawful recreational firearm-related activity in the District, or on his way to or from such activity in another jurisdiction; provided, that such person, whenever in possession of a firearm, shall upon demand of any member of the Metropolitan Police Department, or other bona fide law enforcement officer, exhibit proof that he is on his way to or from such activity, and that his possession or control of such firearm is lawful in the jurisdiction in which he resides; provided further, that such weapon shall be transported in accordance with § 22–4504.02; or (4) Any person who temporarily possesses a firearm registered to another person while in the home of the registrant; provided, that the person is not otherwise prohibited from possessing firearms and the person reasonably believes that possession of the firearm is necessary to prevent imminent death or great bodily harm to himself or herself.

14. In 2009, the Council enacted amendments to § 7–2502.02 by adding a new exception in subsection 4(C) for "[a]ny person who seeks to register a pistol for use in self-defense within that person's home."

15. The Council amended § 22–4504(a) in 2009 by adding the following subsection:

(a–1) Except as otherwise permitted by law, no person shall carry within the District of Columbia a rifle or shotgun. A person who violates this subsection shall be subject to the criminal penalties set forth in subsection (a)(1) and (2) of this section.

found at 22 DCMR § 2304.[16] Section 2304 consisted of provisions pertaining to the licensing of concealed weapons, including the carrying of a pistol. Section 2304.15 specified: "An applicant shall register the pistol for which the license will apply," and § 2304.16 provided: "A license to carry a weapon shall be required whether the weapon is to be carried openly or on or about the person in a concealed manner." 24 DCMR §§ 2304.15, 2304.16 (February 1985).

■■■■■ We now turn our attention to Mr. Plummer's contention that the statutes under which he was convicted, which require licensing and registration of a handgun are invalid on their face and the government's counter argument that there is no facial invalidity. Broad, facial challenges to the constitutionality of a statute impose a heavy burden on the parties and rarely succeed. This is so because "a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the [a]ct would be valid,' *i.e.,* that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)); *see also Gonzales v. Carhart,* 550 U.S. 124, 167, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) ("Broad challenges of this type impose 'a heavy burden' upon the parties maintaining the suit.") (citing *Rust v. Sullivan,* 500 U.S. 173, 183, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)). Moreover, "a facial challenge must fail where the statute has a plainly legitimate sweep." *Washing-*

*ton State Grange,* 128 S.Ct. at 1190 (citing *Washington v. Glucksberg,* 521 U.S. 702, 739–40, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring in judgments)) (internal quotation marks omitted). Here, the District's statutes requiring licensing and registration of pistols or handguns have a legitimate and significant penal purpose, and "[w]hen determining whether a law is facially invalid, ... we must be careful not to ... speculate about hypothetical or imaginary cases or to premature[ly] interpret[ ] ... statutes on the basis of factually barebones records." *Warshak v. United States,* 532 F.3d 521, 529 (6th Cir.2008) (internal quotation marks and citation omitted). In this case, we do not have the kind of record that enables us to consider a wide range of situations and circumstances in which the statutes at issue here might apply.

■■■■ Furthermore, the Supreme Court "recognize[s] a ... facial challenge in the First Amendment context under which a law may be overturned as impermissibly overbroad because a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Washington State Grange,* 128 S.Ct. at 1191 n. 6 (citations omitted). But, in this case, we are not confronted with statutes whose language or purpose invoke First Amendment considerations. Mr. Plummer correctly notes, however, that the overbreadth doctrine has been applied in other settings, but *Sabri v. United States,* 541 U.S. 600, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004), a case involving a facial challenge to a federal bribery statute, emphasized that the doctrine has

**16.** The Metropolitan Police Department issued a final rulemaking on June 5, 2009, in which it repealed § 2304, and amended § 2305 by inserting provisions governing the registration of firearms, including general provisions for the registration of firearms, dis-

qualifications for registration, and "Procedures and Requirements for Registration of a Pistol for the Purpose of Self-defense within Applicant's Home." 24 DCMR § 2320; 56 D.C.Reg. 4380 (2009).

been applied "in relatively few settings" which, other than First Amendment cases, include the right to travel, abortion, and legislation enacted under § 5 of the Fourteenth Amendment. *Id.* at 609–610, 124 S.Ct. 1941 (citations omitted). The Court explained that "[f]acial challenges [like the challenge to the bribery statute] are especially to be discouraged" and that "[f]acial adjudication carries too much promise of 'premature interpretatio[n] of statutes' on the basis of factually bare-bones records." *Id.* at 609, 124 S.Ct. 1941 (citations omitted). Even assuming that the overbreadth doctrine were applicable to the challenge to the constitutionality of this jurisdiction's UF and CPWL statutes, we are confident that Mr. Plummer would not be able to sustain his burden on this record since "the overbreadth claimant bears the burden of demonstrating, from the text of [the law] and from actual fact, that substantial overbreadth exists." *Virginia v. Hicks,* 539 U.S. 113, 122, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003) (citing *N.Y. State Club Ass'n v. City of New York,* 487 U.S. 1, 14, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988)) (internal quotation marks omitted).

What we noted in *Sims, supra,* in a plain error context, is no less applicable in this case: It is not "clear or obvious that appellant may mount the facial challenge to the statutes that he does on the theory that they cannot be constitutionally applied to other, differently situated defendants." 963 A.2d at 150 n. 2 (citations omitted). We reached a similar conclusion in *Howerton, supra,* when we said: "The opinion in *Heller* leaves no doubt that, collectively, the District's gun control laws, and the District's application of these laws and their implementing regulations, swept too broadly, amounting to 'a ban on handgun possession in the home' that 'violates the Second Amendment.... That does not mean, however, that any of the particular statutes at issue here is facially invalid.'"

964 A.2d. at 1288 (citation omitted). And, in *Brown v. United States,* a case involving a person who committed crimes at the age of seventeen, we stated: "On its face, the licensure requirement that the CPWL statute imposes does not appear as a substantial obstacle to the exercise of Second Amendment rights. Moreover, while the statute indisputably imposes a regulatory restriction on the right to bear arms, on its face it does not stifle a fundamental liberty." 979 A. 2d at 638 (2009) (citing *United States v. Miller,* 604 F.Supp.2d 1162, 1170 (W.D.Tenn.2009)). In sum, we hold that D.C.Code §§ 7–2502.01(a) and 22–4504(a), under which Mr. Plummer was convicted, are not facially invalid.

■ "As-applied challenges—the 'basic building blocks of constitutional adjudication'—remain the preferred route" to challenge the constitutionality of a statute. *Warshak, supra,* 532 F.3d at 529 (citing *Gonzales, supra,* 550 U.S. at 168, 127 S.Ct. 1610). On February 20, 2004, Mr. Plummer filed a motion to dismiss the indictment against him on Second Amendment grounds. In this court, he argues that faced with "an unconstitutional ban on the possession and carrying of pistols," he "was not first required to seek registration and licensing of a pistol—precisely what the statutes prohibited—before exercising his 'fundamental,' 'pre-existing' right to possess and carry a pistol in his home." (Emphasis omitted.) He claims that "he was free to disregard the invalid statutes and to challenge their constitutionality as a defense to his criminal convictions." The government contends that "(one subject to a facially valid licensing requirement cannot defy that requirement and then argue later that he or she would have been entitled to obtain a license....") The government further maintains that "a litigant who thinks he or she has a right to obtain a license to engage in given conduct must

not only seek a license but also must, if necessary" file a civil judicial challenge to the licensing statute. In reply, Mr. Plummer insists that his "convictions granted him standing to challenge the statutes under which he was convicted, so he was not required to engage in the futile exercise of seeking registration and licensing of a pistol in order to raise a Second Amendment claim." He further maintains that "like the respondent in *Heller*, who challenged the statutes through a civil rights lawsuit rather than through review of a denial of registration, he is entitled to challenge the statutes through criminal proceedings rather than through review of a denial of registration."

In *Brown, supra,* we determined that the CPWL statute, as applied to an adjudicated delinquent who had absconded from a juvenile detention facility and who had a severe drug and alcohol problem, was not unconstitutional.[17] The case before us is factually different and involves issues which were not raised in *Brown.* Moreover, background information about the appellant in *Brown* was more extensive than that reflected in the record in this case.

The parties here have differing conceptual approaches to this case. The government sees the case as involving a facially valid licensing and regulatory law which, under *Poulos v. New Hampshire,* 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953), required Mr. Plummer to seek a license (and a denial of a license) before challenging the UF and CPWL statutes. In contrast, Mr. Plummer regards the case as pertaining to the application to him of an invalid and unlawful outright ban on the registration (and consequent licensing) of his handgun, and hence, he argues that different cases permit him to challenge the application of the handgun licensing and regulatory scheme to him as a defense to his criminal prosecution.

We think that, under the circumstances of this case and given the decision in *Heller*, Mr. Plummer's argument is more persuasive. In light of the handgun registration and licensing scheme in effect at the time of the incident in this case, Mr. Plummer could not have registered his handgun, but registration was a prerequisite to obtaining a license, despite the Second Amendment right to keep a handgun in his

---

**17.** We said:

> Under either ... intermediate scrutiny or a consideration of whether the [statutory] restriction is "similar enough ... to justify its inclusion in the list of 'longstanding prohibitions' that survive Second Amendment scrutiny"—we have little trouble concluding that the enforcement of the CPWL statute involved here was lawful.... For even if, as *amicus* argues, "[t]he firearm registration and licensing statutes under which [appellant] was prosecuted amount to an unconstitutional ban on the carrying of pistols by *ordinary* citizens," appellant was hardly an ordinary citizen on January 21, 1999 (italics added). Appellant was an adjudicated delinquent, was serving what amounted to a sentence in a juvenile detention facility, had absconded from the facility, and was the subject of a custody order (and, as his counsel acknowledged at his disposition hearing, had "a severe drug and alcohol problem" at the time of his offense). Prohibiting an adjudicated delinquent still under sentence for his offenses from obtaining a license to carry a pistol, and punishing him for carrying a pistol without a license, serve an important governmental objective and, in our view, fit easily with the list of prohibitions that survive Second Amendment scrutiny. In short, that District law did not afford appellant license to carry a pistol on January 21, 1999, did not infringe appellant's rights under the Second Amendment.
>
> We perceive no impediment to sustaining appellant's CPWL conviction, because appellant's carrying of Hawkins's pistol at *Seventh & O Streets* was *not constitutionally protected as an instance of bearing arms for self-defense.*

*Brown,* at 642.

home for defensive purposes.[18] D.C.Code § 7–2502.02(a)(4) precluded the issuance of a registration certificate for a "[p]istol not validly registered to the current registrant in the District prior to September 24, 1976," except as specified; the exception clause did not include an ordinary citizen who desired to register a pistol for defensive use in the home.[19] Moreover, *Heller* made clear that the total ban on handgun possession in the home for self-defense, family defense, and property defense "fail[s] constitutional muster." 128 S.Ct. at 2817–18. Parenthetically, we note that Mr. Plummer was found not guilty of carrying a pistol without a license (outside home or place of business), although he was found guilty of the lesser-included charge of carrying a pistol without a license.[20]

In short, we do not believe that this case is controlled by *Poulos*. Rather, we conclude that Mr. Plummer preserved and had standing [21] to raise the Second Amendment issue as a defense to the criminal charges against him by moving to dismiss the indictment, even though he did not attempt to obtain a registration certificate and license for his handgun prior to his

---

18. Arguably, there is support for Mr. Plummer's futility argument in case law pertaining to the somewhat analogous ripeness doctrine and administrative futility. *See Anaheim Gardens v. United States*, 444 F.3d 1309, 1315 (Fed.Cir.2006) ("A claimant can show its claim was ripe with sufficient evidence of the futility of further pursuit of a permit through the administrative process."). Mr. Plummer's administrative futility argument is more compelling because the Chief of Police had no discretion under the then existing UF statute and regulations to grant Mr. Plummer a registration certificate, which was required to obtain a license for his handgun.

19. Even though, under its conceptual approach to this case, the government does not concede that it would have been futile for Mr. Plummer to apply for a registration certificate and a license, it nevertheless acknowledges that Mr. Plummer "is correct that the applicable provisions would have precluded the Chief of Police from granting a registration or license to appellant." (Citing D.C.Code § 7–2502.01(a); 24 DCMR § 2304.15.)

In 2009, the Council of the District of Columbia enacted an amendment to § 7–2502.01(b), adding a new exception in subsection 4(C) for "[a]ny person who seeks to register a pistol for use in self-defense within that person's home."

20. During deliberations, the jury sent a note to the trial judge inquiring whether the defense of innocent possession applied to all of the charges on which they were instructed. After counsel for both parties agreed on the response, the trial court informed the jury that the defense of innocent possession applied to all of the charges. While the jurors acquitted Mr. Plummer of CPWL outside the home, they found him guilty of the lesser-included CPWL charge and the UF offense, thus rejecting his innocent possession defense. This does not mean necessarily, however, that Mr. Plummer would have been disqualified from obtaining a registration certificate and license for his handgun prior to his arrest.

21. The D.C. Circuit concluded that Mr. Heller, a District of Columbia special police officer who had a permit to carry a handgun while on duty as a guard at a federal building, had "pre-enforcement" standing to raise the Second Amendment issue because he applied for and was denied a certificate under D.C.Code § 7–2502.02(a), and that denial constituted an injury. *See Parker v. District of Columbia*, 375 U.S.App. D.C. 140, 143–44, 148, 478 F.3d 370, 373–75, 378 (2007). The D.C. Circuit also concluded that the other plaintiffs involved in the case with Mr. Heller did not have standing. *See Parker v. District of Columbia*, No. 04–7041, 2007 WL 2892852, at *1, 2007 U.S.App. LEXIS 22872, at *4 (D.C.Cir. September 25, 2007). Unlike Mr. Plummer's posture before us, the *Parker/Heller* plaintiffs were not charged with UF and CPWL, and hence, they could not claim, as a defense to criminal charges, that as applied to them, the District's handgun registration and licensing laws effectively denied them an opportunity to exercise their Second Amendment right and to attempt to obtain a registration certificate.

arrest. *See Chicago v. Atchison, Topeka & Santa Fe Ry. Co.,* 357 U.S. 77, 89, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958) (where the statute "is completely invalid insofar as it applies to [the company], that company was not obligated to apply for a certificate of convenience and necessity and submit to the administrative procedures incident thereto before bringing this action") (citing *Smith v. Cahoon,* 283 U.S. 553, 562, 51 S.Ct. 582, 75 L.Ed. 1264 (1931)).

Our conclusion that Mr. Plummer had standing to raise the Second Amendment issue, does not resolve this case. The absolute prohibition on Mr. Plummer's application for a registration certificate in order to seek a license for his handgun, effectively foreclosed any attempt to exercise his Second Amendment right. However, *Heller* made it clear that a person could be "disqualified from the exercise of Second Amendment rights," *id.* at 2821–22, and whether Mr. Plummer could have successfully obtained a registration certificate prior to the imposition of charges in this case is a question we cannot resolve on this record. D.C.Code § 7–2502.03, formerly codified at D.C.Code § 6–2313 (1995 Repl.) contains qualifications for registration which could have been used to determine whether Mr. Plummer would have been disqualified from obtaining a registration certificate. Mr. Plummer has not challenged those qualifications; they include age, criminal history, mental capacity, and vision. Because it resolved the Second Amendment issue in accordance with then existing precedent in this jurisdiction, the trial court did not have an opportunity to decide the disqualification issue which involves a mixed question of fact and law.

Accordingly, for the foregoing reasons, we are constrained to remand this case to the trial court with instructions to hold a hearing to determine whether Mr. Plum-

mer would have satisfied the statutory requirements in D.C.Code § 7–2502.03.

*So ordered.*