Evelyn L. **BSHARAH** and Gid
L. White, Appellants,

v.

**UNITED STATES, Appellee.**

Nos. 91–CM–1192, 91–CM–1194.

District of Columbia Court of Appeals.

Argued May 13, 1993.
Decided Aug. 25, 1994.

nell M. Wolfe, appointed by the court, was on the original brief for appellant White.

Douglas F. Gansler, Asst. U.S. Atty., for appellee. Jay B. Stephens, U.S. Atty. at the time the original brief was filed, J. Ramsey Johnson, U.S. Atty. at the time the supplemental brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., Elizabeth Trosman, Lynn C. Leibovitz, and Renate D. Staley, Asst. U.S. Attys., were on the briefs for appellee. Bernadette C. Sargeant, Asst. U.S. Atty., also entered an appearance for appellee.

Before TERRY, SCHWELB, and SULLIVAN, Associate Judges.

TERRY, Associate Judge:

Appellants, husband and wife, were each convicted of carrying a pistol without a license,[1] possession of an unregistered firearm,[2] and possession of unregistered ammunition.[3] They contend on appeal that appellant White's possession of a handgun on a crowded subway train, without more, was insufficient to "create probable cause to arrest a person for carrying an unregistered firearm," that appellant Bsharah's statement that she had a gun (which was then seized) was obtained in violation of her constitutional rights, and that the trial court therefore erred in denying their motions to suppress the guns that were seized from them. They also maintain that the court erred in refusing to give two requested instructions. We affirm.

I

˙ Officer James Burks of the Washington Metropolitan Area Transit Authority ("Metro") Police Department was on patrol at the Federal Triangle subway station in downtown Washington when he received a radio report concerning a man with a gun on a subway train. The report said that the man was traveling in the next-to-last car on an Orange Line train[4] that had just left the

---

Gerson Simon, appointed by the court, for appellant Bsharah.

Mary E. Mullin, Law Student, with whom Michael A. Rotker, Law Student, and Peter H. Meyers, Supervising Atty., were on the supplemental brief, for appellant White. Ja-

1. D.C.Code § 22–3204 (1989).

2. D.C.Code § 6–2311 (1989).

3. D.C.Code § 6–2361 (1989).

4. There are five subway lines in the Metro system, each of which is designated by a color: Red, Orange, Yellow, Green, and Blue. The Orange and Blue Lines run over the same track through downtown Washington, then branch out in dif-

Farragut West station, headed east toward the Metro Center station. The dispatcher described the suspect as a man with receding hair pulled back in a ponytail, wearing khaki pants and a blue shirt and accompanied by a woman and child.

A minute or two later, when an Orange Line train pulled into the Federal Triangle station (the next one down the line from Metro Center), Officer Burks immediately saw appellant White through the window of the train. He matched the broadcast description and was standing in the next-to-last car alongside a woman and a young boy.[5] The officer also saw the butt of a gun protruding from White's left rear pants pocket. Officer Burks drew his own gun from its holster, entered the train as soon as the doors opened, and asked White to accompany him off the train. As White stepped onto the platform, Officer Burks put his gun back in its holster and removed a loaded .22 caliber revolver from White's pocket. White appeared surprised and told Officer Burks that he was licensed to carry the gun. The woman and the boy followed the two men from the train. The woman, appellant Bsharah, said that she and her husband were gun dealers from Virginia and had permits to carry firearms. When Burks asked Bsharah whether she was also armed, she answered "Yes" and said she was carrying a gun in her front pants pocket. Officer Burks then removed from Bsharah's pocket a loaded .25 caliber semi-automatic pistol. While in the subway station, Officer Burks made several telephone calls to determine whether appellants were licensed to carry firearms in the District of Columbia.[6] After learning that they were not, Burks placed them both under arrest.

White and his family were residents of Fredericksburg, Virginia, about fifty miles south of Washington, who had come to the city for the day. He testified that he and his wife and son had traveled from the Virginia Square subway station in Arlington, Virginia, into the District of Columbia to visit the Smithsonian Institution and the National Zoo. White said that just before boarding the train, he realized that he had his gun with him, so he asked the station manager at Virginia Square whether it was safe to leave weapons locked in the trunk of his car in the Metro parking lot next to the station. He identified himself to the station manager as a gun dealer licensed by both the state and federal governments and said that he had a permit to carry the weapon.[7] The station manager advised him that the parking lot was "not a good place to leave things," that it was not regularly patrolled, and that he himself would not leave anything there, but he added that it was lawful for White to take his handgun into the District of Columbia. Although his wife recommended against it, White decided to keep his gun with him, and he and his wife boarded the subway train with their guns in their pockets.

Bsharah's testimony, both at the pre-trial suppression hearing and at trial, was substantially the same as her husband's.

After hearing the testimony of Officer Burks and both appellants, the court denied appellants' motions to suppress the guns that had been seized from them and certain statements they had made at the time of their arrest. Resolving a factual dispute in the evidence,[8] the court said that "when the officer saw Mr. White on the train and he met [the broadcast] description, I find that he also was able to see the gun...." As to Bsharah, the court held that she had been

---

ferent directions at either end as they approach the suburbs.

5. It was about 3:00 p.m., and, according to Officer Burks, the train was "pretty crowded," with "lots of people standing up."

6. White and Bsharah each produced permits to carry guns in Virginia and showed them to the officer.

7. White was a retired Army master sergeant. He testified that one of his principal duties while in the Army was to serve as a firearms safety in-

structor. "I was always involved with firearms. I had thousands under my control at any one given time, usually. And I have sort of gotten very used to them."

8. Officer Burks testified that he could see the gun protruding from White's rear pocket while White was still on the train. Both White and Bsharah, however, said that the gun was not visible and that it was not discovered until the officer patted White down on the station platform.

lawfully subjected to a *Terry* stop,[9] that "the questions that were asked of her were proper investigative questions [because] they came after the gun had been found on Mr. White," that she had "volunteered" the statement "that she and her husband were gun dealers and had licenses to carry their weapons," and that her statement "was made in response to the gun being found on her husband...."

At the subsequent trial, the government established through documentary evidence that neither appellant was licensed to carry a gun in the District of Columbia and that the guns and ammunition seized from them were not registered in the District. Appellants introduced into evidence copies of their federally issued firearms dealer licenses. They requested an instruction on mistake of law, based on the advice given to them by the Metro station manager at Virginia Square, but the court denied their request.

## II

■ Officer Burks testified that he saw a gun protruding from White's pocket as the subway train pulled into the station, before the doors to the train opened. The trial court credited this testimony, finding that Burks "was able to see the gun," and denied White's motion to suppress the gun on that basis. White argues that Burks' observation *of a handgun in his pocket did not give Burks* probable cause to arrest him.[10] We disagree.

We have held on several occasions that a police officer who has reliable knowledge that a person is in possession of a handgun [11] has probable cause to arrest that person for the crime of carrying a pistol without a license (CPWL). For example, in *Poteat v. United States,* 330 A.2d 229, 232 (D.C.1974), in which a passenger in an automobile told a police officer that the driver had a gun, we held that the officer had a "constitutional justification" for seizing the gun and arresting the defendant for CPWL. Similarly, in *Murphy v. United States,* 293 A.2d 849 (D.C.1972), a police officer received a radio report describing a man seated at a certain table in a restaurant and stating that the man had a gun and that his name was Murphy. The officer went to the restaurant and immediately saw the defendant, who matched the broadcast description and was seated at the designated table. After asking him whether his name was Murphy and being told that it was, the officer arrested him and seized a gun from his coat pocket. We upheld the arrest and seizure, citing several cases. *Id.* at 850–851. Again, in *Contee v. United States,* 212 A.2d 342, 343 (D.C.1965), we held that an officer had probable cause to arrest a defendant for CPWL when the only basis for the arrest was the fact that the officer saw the defendant "with a gun in his hand in plain view." [12]

■ The argument that Officer Burks lacked probable cause because White was not acting "suspiciously" is not supported by the case law; indeed, the cases we have cited— *Poteat, Murphy, Contee*—indicate just the opposite. Although there are a few very limited exemptions (one of which we shall address in part III, *infra* ) from the CPWL statute, we hold that a police officer who sees a non-uniformed person [13] carrying a pistol in

9. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

10. The government maintains that White has waived any claim that the officer's sighting of the gun in his pocket was not enough to constitute probable cause, since he did not make this precise argument in the trial court. *See Duddles v. United States,* 399 A.2d 59, 65 (D.C.1979); Super.Ct.Crim.R. 12(d). Although the government's argument is not without force, we need not rely on it as a basis for our decision because White's claim of error is so conspicuously without merit.

11. In this case there can be no question that the officer's knowledge was reliable because it was based on his own personal observation.

12. White concedes, as he must, that Officer Burks had probable cause to believe that he was carrying a pistol, but argues that the officer had no such cause to believe that the pistol was unlicensed. It is common knowledge, however, that with very rare exceptions licenses to carry pistols have not been issued in the District of Columbia for many years and are virtually unobtainable. Officer Burks would therefore have been fully justified in believing it was highly unlikely that White had such a license.

13. Among those exempted from the proscriptions of the CPWL statute are police officers, marshals, sheriffs, "other duly appointed law-enforcement officers," and members of the armed services "when on duty." *See* D.C.Code § 22–3205(a) (1994 Supp.).

a public place could reasonably conclude that that person is violating the law and would therefore have probable cause to arrest the person for carrying a pistol without a license. We agree with the government that requiring a police officer to wait for additional suspicious actions by a person carrying a concealed (or unconcealed) handgun would raise an unreasonable risk of harm to all concerned—the public, the officer, and the person himself. For these reasons we conclude that the trial court did not err in denying White's motion to suppress the gun.

■ Bsharah's argument for suppression is somewhat different from her husband's. She argues that Officer Burks did not have any articulable suspicion to effect a *Terry* stop and failed to advise her of her *Miranda* rights[14] before asking her if she was armed.

The trial court found that Bsharah "did not simply accompany her husband as he was taken off the train" but that she was "taken off the train" as well. The court held, however, that this momentary detention was a *Terry* stop, and we assume for the purposes of this discussion that it was. While thus momentarily detained, Bsharah made a statement—which the court found to have been "volunteered"—that she and her husband were gun dealers and had licenses to carry their weapons. Since Officer Burks had just found a gun in her husband's pocket, the court held that it was reasonable for the officer, upon hearing this statement, to ask Bsharah whether she was also carrying a weapon. Her response to that question led to her arrest and the seizure of her gun.

■ We hold that Officer Burks' brief detention of Bsharah was a reasonable response to the situation with which he was confronted. He had to act quickly, since the train would be in the station for a very short time. He not only had received information that Bsharah's companion had a gun, but had seen the gun himself in White's pocket. He had no way of knowing whether Bsharah was carrying a gun as well, but under the circumstances it was reasonable for him to suspect that she might be. He also saw that the train on which White and Bsharah were riding was, as he testified, "pretty crowded." We find nothing unreasonable in the officer's decision to remove both Bsharah and White from the train to the station platform, where he could more effectively control the situation and reduce the risk of harm to the passengers on the train. We agree with the trial court that the detention of Bsharah was a permissible response to an uncertain and potentially volatile situation, and that her Fourth Amendment rights were therefore not infringed. From this it follows that there was no error in denying Bsharah's motion to suppress both her statement and her gun. We reject her contention that the statement (which led to the seizure of the gun) was obtained in violation of her *Miranda* rights because, when a person is subjected only to a *Terry* stop, *Miranda* warnings are not required. *See Berkemer v. McCarty*, 468 U.S. 420, 439–440, 104 S.Ct. 3138, 3149–50, 82 L.Ed.2d 317 (1984).

### III

■ Appellants maintain that the fact that they are federally licensed dealers in firearms authorizes them to carry handguns without a license in the District of Columbia. Specifically, they contend that they are exempt from the District of Columbia licensing requirement because they belong to a special class—"dealers"—whose members are statutorily exempt from the prohibitions found in D.C.Code § 22–3204, the CPWL statute, and that the jury should have been instructed on this exemption. The trial court denied their request for such an instruction because they had failed to prove that they were acting in the ordinary course of business when they had the guns in their possession.

D.C.Code § 22–3205(a) provides in part:

The provisions of § 22–3204 shall not apply to ... any person *engaged in the business of* manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol *in the usual or ordinary course of business....* [Emphasis added.]

14. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellants assert that the "ordinary course of business" requirement applies only to the agents and representatives of firearms dealers, not to the dealers themselves. Their argument is based primarily on the placement of a comma after the word "firearms" in section 22–3205(a). The government reminds us, however, that "[t]he presence or absence of a comma, according to the whim of the printer or proof reader, is so clearly fortuitous that it is wholly unsafe as an aid to statutory interpretation." *Erie R.R. v. United States*, 240 F. 28, 32 (6th Cir.1917); *accord, e.g., United States National Bank v. Independent Insurance Agents of America, Inc.*, —— U.S. ——, ——, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993) ("punctuation alone [is not] a reliable guide for discovery of a statute's meaning").

■ We need not decide whether appellants' syntactical analysis of the statute is correct because, even assuming (without deciding) that it is,[15] we conclude that the statutory exemption for dealers applies only to a dealer who is actually "engaged in the business of" dealing in firearms while in possession of a pistol. Since appellants were not so "engaged," they were not entitled to their requested instruction.

■ When a defendant relies on a statutory exception as an affirmative defense to a criminal charge, the burden is on the defendant to bring himself or herself within the exception. *Middleton v. United States*, 305 A.2d 259, 261 (D.C.1973). The government need not prove that the defendant does not fall within the exception, "particularly where the exception is contained in a separate statute from that defining the offense," as in this case. *Jacobs v. United States*, 436 A.2d 1286, 1287 n. 1 (D.C.1981) (citing cases). Appellants failed to meet their "burden of proceeding with the evidence." *Williams v. United States*, 237 A.2d 539, 541 (D.C.1968)

(citation omitted). Their defense was based only on the fact that they are both federally licensed gun dealers. That fact, however, does not support their argument because Congress has made clear that the federal licensing statute is not intended to preempt or supersede state and local firearms laws. *See* 18 U.S.C. § 927 (1988).[16]

■ Our construction of D.C.Code § 22–3205(a) is guided by a significant body of case law holding that exceptions to the CPWL statute, section 22–3204, must be "narrowly circumscribed ... given the clear intent of Congress." *Logan v. United States*, 402 A.2d 822, 826 (D.C.1979). In enacting what is now section 22–3204, Congress "evidenc[ed] the clearest intent to drastically tighten the ban on dangerous weapons," *Cooke v. United States*, 107 U.S.App.D.C. 223, 225, 275 F.2d 887, 889 (1960), in order to protect the citizens of the District of Columbia from injuries resulting from the use of such weapons. *Strong v. United States*, 581 A.2d 383, 387 (D.C.1990). Congress was particularly concerned with the "substantial injury and loss of life attributable to the unlawful use of firearms" and sought, by its enactment of section 22–3204, to reduce the number of injuries and deaths. *Billinger v. United States*, 425 A.2d 1304, 1305 (D.C. 1981) (citing legislative history); *see also Cooke, supra*, 107 U.S.App.D.C. at 225 n. 3, 275 F.2d at 889 n. 3 (listing statutes prohibiting the carrying of dangerous weapons in the District of Columbia dating back to 1871). Section 22–3204 was specifically "designed to keep such dangerous items off the street." *Roper v. United States*, 564 A.2d 726, 730 (D.C.1989) (citation omitted). Given this congressional purpose, we have been most grudging in our allowance of exemptions from the statute. *See Logan, supra*, 402 A.2d at 825 ("judicial recognition of exceptions to the statute has been extremely limited"). While *Logan* and other cases have

15. *But see United States v. Pritchett*, 152 U.S.App. D.C. 307, 311, 470 F.2d 455, 459 (1972) (treating as a single exempt group "firearms manufacturers and dealers and those who repair firearms," without differentiating between dealers and their agents).

16. Section 927 states that "[n]o provision of this chapter shall be construed as indicating an intent

on the part of the Congress to [preempt] the law of any State on the same subject matter," unless the state law and the federal law "cannot be reconciled or consistently stand together." The statute which authorizes the licensing of firearms dealers, 18 U.S.C. § 923, is part of "this chapter." "The term 'State' includes the District of Columbia...." 18 U.S.C. § 921(a)(2) (1988).

mostly dealt with non-statutory exceptions such as "innocent" possession of a weapon, we see no reason to construe statutory exceptions any more broadly.

Thus guided by *Logan* and the need to keep any exception to the CPWL statute as narrow as possible, we read section 22–3205(a) as limiting the exemption for dealers to someone who has a pistol in his or her possession while actually "engaged in the business of" dealing in firearms. When a dealer is not so "engaged"—for example, when he or she is sitting in a movie theater or shopping at a supermarket, or (as in this case) riding on a subway while on personal business—the exemption does not apply. We find a parallel in cases involving special police officers, who are authorized to carry firearms only when they are on duty, and thus are subject to the CPWL statute when off duty. *E.g., Shivers v. United States,* 533 A.2d 258, 260–261 (D.C.1987); *Timus v. United States,* 406 A.2d 1269, 1272 (D.C. 1979); *Franklin v. United States,* 271 A.2d 784, 785 (D.C.1970), *aff'd,* 148 U.S.App.D.C. 39, 458 F.2d 861 (1972); *McKenzie v. United States,* 158 A.2d 912, 913 (D.C.1960). In each of these cases a special police officer, charged with carrying a pistol without a license, sought to claim the exemption in section 22–3205 for "policemen or other duly appointed law enforcement officers," but in each case the claim was rejected because the defendant had been carrying a pistol while off duty, usually a substantial distance from his place of employment and several hours before or after his scheduled work shift. These cases collectively stand for the proposition that a person with a limited right to carry a gun while on duty has no such right when off duty. The same principle applies here.

Appellants' evidence showed that they were not "engaged" in any "business" at all when they were riding on the subway but, on the contrary, were on a family pleasure trip to a museum. We therefore hold that the trial court committed no error in refusing to instruct the jury on the statutory exception for firearms dealers because there was no evidence to support such an instruction. *See Doby v. United States,* 550 A.2d 919, 920

(D.C.1988) ("an instruction need not be given when there is no factual or legal basis for it" (citations omitted)).

## IV

At trial both appellants made much of the fact that they had been advised by the station manager at the Virginia Square subway station that they could lawfully carry their guns in the District of Columbia. The trial judge, however, refused to allow them to argue this point to the jury and refused to give an instruction on mistake of law as a defense to the charges. The judge's reasons, which we have gleaned from various parts of the record (the subject came up fairly often), were essentially threefold. First, the judge ruled that a mistake of law defense was not available because the crimes charged were all crimes of general intent. Second, she concluded that a Metro station manager had no authority, or even apparent authority, to interpret District of Columbia firearms laws. Third, she ruled that appellants' reliance on the station manager's advice was inherently unreasonable. We agree with all three reasons.

This court has held that carrying a pistol without a license is a crime of only general intent. *McMillen v. United States,* 407 A.2d 603, 604–605 (D.C.1979); *accord, Brown v. United States,* 379 A.2d 708, 710 n. 3 (D.C.1977) (dictum). Although we have never expressly considered the intent element of the other two offenses involved here, possession of an unregistered firearm and possession of unregistered ammunition, we see no rational basis for drawing a distinction between them and CPWL. All three crimes are possessory offenses, and there is nothing in any of the three statutes defining them [17] that even hints at a requirement of specific intent. *Cf. McIntosh v. Washington,* 395 A.2d 744, 756 (D.C.1978) (knowledge of duty to register is not an element of crime of failure to register under what is now section 6–2311). We therefore hold that all three are general intent crimes, and that no specific intent to use the gun (or the ammunition) need be proved in order to obtain a convic-

---

**17.** See notes 1, 2, and 3, *supra.*

tion under any of the three statutes. It is also solidly established that "[g]eneral intent is not negated by a mistaken belief about the applicability of a penal law." *Morgan v. District of Columbia,* 476 A.2d 1128, 1133 (D.C.1984) (citation omitted). Consequently, a claim of mistake of law, without more, cannot be relied upon by a defendant charged with a general intent crime.

Appellants, however, claim an exception to this rule, arguing that they may assert a limited mistake of law defense because they reasonably relied upon the advice of the Metro station manager. A similar claim was considered by the court in *United States v. Barker,* 178 U.S.App.D.C. 174, 546 F.2d 940 (1976). Unfortunately, there was no opinion for the court in *Barker.* Two members of the court, Judges Wilkey and Merhige, voted to reverse the convictions of Barker and his co-defendant Martinez, but for different reasons, while Judge Leventhal dissented on the ground that the defendants' asserted reliance on the advice of a high government official did not negate their criminal responsibility. A different panel of the same court, almost fifteen years later, having reviewed the *Barker* case, could find in it no discernible legal standard: "[W]e have read *Barker,* and reread it, and simply cannot find in it a rule of law to apply." *United States v. North,* 285 U.S.App.D.C. 343, 379, 910 F.2d 843, 879, *modified in part on other grounds,* 287 U.S.App.D.C. 146, 920 F.2d 940 (1990), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

The *North* court may well be correct in its overall reading of *Barker,* but there is at least one respect in which Judges Wilkey and Merhige agreed. Judge Wilkey said that one element of the defense asserted by Barker and Martinez was "reasonable reliance on [the] apparent authority" of another to authorize their actions. 178 U.S.App.D.C. at 183, 546 F.2d at 949. Judge Merhige, taking a narrower view of the proffered defense, nevertheless concluded that the defense was available to a defendant who "reasonably" relied on a conclusion or statement of law "issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field."

*Id.* at 189, 546 F.2d at 955; *see* MODEL PENAL CODE § 2.04(3)(b) (1985). Thus both judges agreed on two points: first, that the person advising the defendant must have actual (Judge Merhige) or apparent (Judge Wilkey) authority to interpret or administer the law in question, and second, that the defendant's reliance on the other person's advice must be reasonable. Without endorsing the particular view of either Judge Merhige or Judge Wilkey, we conclude that appellants' proffered defense does not meet either requirement.

The defense advanced by White and Bsharah appears to have originated in two Supreme Court cases. In *Raley v. Ohio,* 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), the defendants were convicted of contempt for refusing to answer certain questions put to them by a state investigating commission, even though they had relied on prior assurances by the chairman of the same commission that they were entitled to assert their Fifth Amendment privilege against self-incrimination. Unknown to the chairman, his advice was contrary to state law. Nevertheless, the Supreme Court reversed the convictions because of the chairman's erroneous assurance to the defendants that they could lawfully refuse to answer. The key to the Court's decision was the fact that the chairman "clearly appeared to be the agent of the State in a position to give such assurance." *Id.* at 437, 79 S.Ct. at 1266. A few years later, in *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), the Court reversed the convictions of a group of picketers who had been demonstrating across the street from a courthouse, contrary to state law, because the local chief of police had given them permission to picket at that location. Again the Court based its decision on the fact that the defendants had been misled by "the highest police officers in the city." *Id.* at 571, 85 S.Ct. at 484.

The instant case is different because the Metro station manager had no authority, real or apparent, to give these appellants any advice whatever about the District of Columbia firearms laws. He could, perhaps, advise them about transit regulations and subway schedules, but on the subject of firearms he

could speak with no more authority than any ordinary citizen. In the words of the Supreme Court, he was not an "agent of the State in a position to give [any] assurance" about the legality of carrying guns in the District of Columbia. *Raley v. Ohio, supra,* 360 U.S. at 437, 79 S.Ct. at 1266. His lack of authority was fatal to appellants' defense, as other courts have recognized in comparable circumstances. *See United States v. Etheridge,* 932 F.2d 318, 320–321 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 323, 116 L.Ed.2d 264 (1991); *United States v. Bruscantini,* 761 F.2d 640, 642 (11th Cir.), *cert. denied,* 474 U.S. 904, 106 S.Ct. 271, 88 L.Ed.2d 233 (1985). Moreover, he was not even a District of Columbia official but an employee of an interstate transit authority, uniquely created by an interstate compact. *See generally Qasim v. Washington Metropolitan Area Transit Authority,* 455 A.2d 904, 905–906 (D.C.) (en banc), *cert. denied,* 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983). That fact also demolishes appellants' defense. "Where ... the government that advises and the government that prosecutes are not the same ... [the defendant] is not insulated from prosecution." *United States v. Bruscantini, supra,* 761 F.2d at 642.

Finally, we agree with the trial court that appellants' reliance on the station manager's advice was inherently unreasonable.[18] White and Bsharah were licensed by the state of Virginia to carry weapons and licensed by the federal government to deal in firearms. They both testified that they had been subjected to rigorous background checks in order to obtain their federal licenses. White also stated that while in the Army he had been a military police officer and a weapons safety instructor, experience which indicates a knowledge of firearms far greater than that of the average citizen. We conclude that no person in such circumstances, claiming to be highly informed and experienced in the use

and sale of firearms,[19] would reasonably risk potential criminal liability, and perhaps the non-renewal of his license to deal in firearms, on the basis of a brief conversation with a subway station manager. White testified that in the past, when traveling to other jurisdictions, he would regularly contact local police officials about the legality of carrying a weapon, yet he did not do so here. All this leads us to conclude that appellants' reliance on the station manager's advice was unreasonable as a matter of law.

For the foregoing reasons, the convictions of both appellants are

*Affirmed.*

---

18. The reasonableness of the reliance is an issue of law. *See Fersner v. United States,* 482 A.2d 387, 393 (D.C.1986). The Ninth Circuit has held that a defendant asserting the defense of "official misleading," as these appellants are, must establish "that his reliance on the misleading information was reasonable—in the sense that a person sincerely desirous of obeying the law would have accepted the information as true, and would not

have been put on notice to make further inquiry." *United States v. Lansing,* 424 F.2d 225, 227 (9th Cir.1970).

19. *Cf. United States v. Tallmadge,* 829 F.2d 767, 774 (9th Cir.1987) (licensed federal firearms dealers deemed agents of the government in firearms transactions).