*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CF-0571

ALLEN GRANT, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2022-CF2-007628)

(Hon. Erik P. Christian, Trial Judge)

(Submitted January 13, 2026                    Decided February 26, 2026)

*Peter H. Meyers* was on the briefs for appellant.

*Edward R. Martin, Jr.*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *Joni M. Gerrity*, *Alexis N. Dunlap*, and *David P. Saybolt*, Assistant United States Attorneys, were on the brief for appellee.

Before EASTERLY and SHANKER, *Associate Judges*, and RUIZ, *Senior Judge*.

SHANKER, *Associate Judge*: At around 8:00 p.m. on a late-December night in 2022, District of Columbia Metropolitan Police Department (MPD) Officer Ty Amarant-West responded to a radio call reporting several large, disorderly groups gathering in connection with a local rapper's appearance in Southeast Washington, D.C. The crowd was dispersing as Officer Amarant-West approached, but as he

began to drive away, he observed a group of four men walking in the same direction and heard through his cracked window one of them make a comment that, in Officer Amarant-West's view, related to engaging in gun violence. After initially monitoring the group, Officer Amarant-West got out of his car and, after following them for a short period, began talking to the four men. Appellant Allen Grant was one of the four, and, without being asked, he told Officer Amarant-West that he did not have any guns in his possession. Mr. Grant was carrying a satchel across his torso and, after Officer Amarant-West asked him what it contained, he moved it from his right hip to his lower his back and under his jacket.

Concerned by this movement, Officer Amarant-West asked Mr. Grant multiple times why he moved the satchel and to let him see it. Mr. Grant denied having anything in the satchel and continued walking down the sidewalk. With Officer Amarant-West following him, Mr. Grant removed the satchel from his body and threw it over a fence into a nearby grassy area. As Mr. Grant walked away, another officer inspected the satchel and found a gun with an extended magazine. Moments later, Mr. Grant, who was still being followed by Officer Amarant-West, broke into a run and fled. After this initial interaction with police, Mr. Grant evaded officers for approximately thirty minutes before being arrested.

Prior to his trial for multiple offenses stemming from that arrest, Mr. Grant moved to suppress all evidence obtained from the satchel. The trial court denied Mr. Grant's motion, finding that Mr. Grant was not seized within the meaning of the Fourth Amendment before he threw the satchel. We affirm because we agree that the police did not seize Mr. Grant until he was arrested after throwing the satchel and an officer found the gun. Consequently, we conclude that the evidence found in the satchel was not the fruit of an illegal seizure and Mr. Grant's motion to suppress that evidence was properly denied.

## I. Factual and Procedural Background

We distill the background below from the trial court's factual findings and, where necessary, evidence from the suppression hearing. *See Mayo v. United States*, 315 A.3d 606, 617 (D.C. 2024) (en banc).

### A. Mr. Allen's Arrest

While on patrol on a December evening, Officer Amarant-West received a radio call from other officers that several "large[,] disorderly groups" were forming in connection with a local rapper's appearance in the area near 3255 23rd Street, SE. This area, according to Officer Amarant-West, was known for "[a] lot of felony offenses," and the District's "ShotSpotter" system had detected approximately

twenty-two gunshots there in the week prior to Mr. Grant's arrest. Officer Amarant-West drove to the area in his marked police cruiser and found the groups dispersing.

As Officer Amarant-West continued his patrol, he observed a group of four individuals, including Mr. Grant, walking down the street. Officer Amarant-West's car window was open, and he heard someone in the group say something like, "They were trying to argue but we're not about that; we're going to get it popping." This concerned Officer Amarant-West because, in his experience, disputes typically occurred after similar large gatherings and often included gun violence. As a result, Officer Amarant-West monitored the group, including by following them into a parking lot, where the four entered a car and then got out and began walking up the street toward an apartment complex.

The rest of the events are visible on Officer Amarant-West's and another officer's body-worn camera (BWC) footage. After first observing that one of the individuals had a satchel, Officer Amarant-West began following the group and called out, "Hey, yo!" As he continued after the group, he turned to an officer trailing behind him and made a comment that is difficult to decipher. The other officer then reported the officers' location over the radio and said that they were "making contact with about four individuals." As Officer Amarant-West got closer

to the group, he called out "hey, yo" again, but no one in the group acknowledged him.

Now closer, Officer Amarant-West asked the group, "Ya'll don't want to talk to us?" At this point, members of the group, including Mr. Grant, began engaging with Officer Amarant-West. Mr. Grant had a red plastic cup in his hand, which Officer Amarant-West later testified is a type "frequently" used to consume alcohol in public and was a "factor" in why he approached the group. Mr. Grant turned to face Officer Amarant-West and, unprompted, opened his jacket, lifted his shirt to reveal his waistband, and told the officer that he did not have any guns. In response, Officer Amarant-West asked, "What about in the satchel you got?" Mr. Grant denied having anything other than "weed" in his satchel. While answering Officer Amarant-West, Mr. Grant moved the satchel from his front right hip area to his lower back, underneath his jacket, and continued walking down the sidewalk.

In response to this movement, Officer Amarant-West asked Mr. Grant why he turned "like that" and told him to "show me the satchel, then." As Officer Amarant-West continued to follow Mr. Grant on the sidewalk, he asked again to see the satchel and asked Mr. Grant, "Why'd you just do it like that?" Officer Amarant-West then appeared to tap Mr. Grant on the arm (the footage is somewhat

unclear) and repeated the question. In response, Mr. Grant turned toward Officer Amarant-West and denied having anything in his satchel.

Mr. Grant continued walking on the sidewalk and Officer Amarant-West followed while shining his flashlight on Mr. Grant. Unprompted, Mr. Grant again denied having anything in his satchel and appeared to shift it with his hands. The satchel was then visible in Mr. Grant's hands, and Officer Amarant-West told Mr. Grant to "hold on for a second." Mr. Grant did not "hold on"; instead, he said, "I'm throwing it," and he threw the satchel past the officer's head and over a fence into a nearby grassy area. He then walked away from Officer Amarant-West.

The other officer, who had been following Officer Amarant-West and Mr. Grant, inspected the satchel, discovered a gun with an extended magazine, and told Officer Amarant-West to stop Mr. Grant. Mr. Grant, who was still being followed by Officer Amarant-West, fled. He evaded the police for approximately thirty minutes before officers found and arrested him.

## B. The Trial Court Proceedings

The government charged Mr. Grant with unlawful possession of a firearm (prior conviction) (FIP) (D.C. Code § 22-4503(a)(1)); carrying a pistol without a license (CPWL) (D.C. Code § 22-4504(a)(2)); possession of a large-capacity

ammunition feeding device (D.C. Code § 7-2506.01(b)); possession of an unregistered firearm (UF) (D.C. Code § 7-2502.01(a)); and unlawful possession of ammunition (D.C. Code § 7-2506.01(a)(3)).

Before trial, Mr. Grant moved to suppress all evidence incident to his arrest because, according to him, Officer Amarant-West seized him without a reasonable suspicion of wrongdoing in violation of the Fourth Amendment. Following a suppression hearing, the trial court denied Mr. Grant's motion. Focusing exclusively on the interaction between Mr. Grant and police prior to Mr. Grant's flight, the court found that "there was no seizure" because Mr. Grant "continued to walk and began running after he threw the satchel." The court further found there was "no show of force" by officers and described the encounter as "an investigatory conversation."[1] Notwithstanding its determination that there had not been a seizure, the court also found that Officer Amarant-West had reasonable articulable suspicion "to speak with Mr. Grant and to investigate further after the initial contact."

The case proceeded to trial, and a jury found Mr. Grant guilty of the FIP, CPWL, and UF counts. The trial court sentenced Mr. Grant to a total of twenty-four

---

[1] The court's decision is somewhat confusing because at one point it called the interaction between Mr. Grant and Officer Amarant-West a *Terry* stop, but shortly thereafter it reiterated that "[a]t no point was [Mr. Grant] stopped or seized."

months of imprisonment to be followed by three years of supervised release. This appeal followed.

## II.  Analysis

Mr. Grant asserts that Officer Amarant-West seized him without reasonable articulable suspicion that he was engaged in criminal activity before he discarded the satchel.  Therefore, in Mr. Grant's view, because the seizure was illegal, the evidence found in the satchel, namely the gun and ammunition, must be suppressed. We conclude that officers did not seize Mr. Grant until after they discovered the gun in his discarded satchel and we therefore affirm the trial court's order denying his motion to suppress.

### A.  Standard of Review

We review a trial court's order regarding a motion to suppress de novo for legal issues, but "generally defer to the trial court's findings of fact 'unless they are clearly erroneous.'" *Mayo*, 315 A.3d at 616.  We view the evidence in the light most favorable to the trial court's ruling. *Id.* at 617.  We are not limited, however, to the trial court's express findings and may examine the "record evidence presented at a suppression hearing to determine whether the government proved that a defendant's

constitutional rights were not violated." *Id.* (citing *Germany v. United States*, 984 A.2d 1217, 1221 (D.C. 2009)).

## B.    Seizures Under the Fourth Amendment

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures.  U.S. Const. amend. IV.  Law enforcement officers may not seize an individual unless they have "either probable cause to arrest an individual for a crime or at least reasonable articulable suspicion that an individual is engaged in criminal conduct to effect the lesser intrusion of a brief *Terry* stop to investigate whether that is in fact the case." *Mayo*, 315 A.3d at 620 (citation modified).

A seizure "can take the form of physical force or a show of authority that in some way restrains the liberty of the person." *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (citation modified); *see also Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). A seizure without the use of physical force "does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).  "So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable

suspicion is required." *Id.* (citation modified). A police encounter may "rise to the level of a seizure if the police 'convey a message that compliance with their requests is required,'" *Golden v. United States*, 248 A.3d 925, 935 (D.C. 2021) (quoting *Bostick*, 501 U.S. at 435), or "if, in view of all the circumstances . . . a reasonable person would have believed that he was not free to leave[,]" *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion)).

As relevant here, for there to be a seizure by a police officer by a show of authority, there must be an "actual submission" by the suspect; "otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254 (2007); *see also Golden*, 248 A.3d at 935 ("Submission requires, at minimum, that a suspect manifest compliance with police orders or requests." (citation modified)). In other words, unless the defendant "yield[s]" to law enforcement's show of authority, a seizure has not occurred. *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *see also United States v. Pope*, 313 A.3d 565, 572 (D.C. 2024) ("[A] police order to stop is not a seizure if the person does not submit to the official command.").

### C.    Discussion

The outcome in this case turns on whether officers seized Mr. Grant prior to discovering the gun in his satchel, because Mr. Grant does not contest that after that point officers had at least reasonable suspicion to seize him.  Mr. Grant does not argue that officers seized him using physical force.  *See Torres*, 592 U.S. at 311. Instead, Mr. Grant contends that he was seized by police when Officer Amarant-West repeatedly demanded to see the satchel he was carrying because those demands made clear that Mr. Grant was not free to leave.  He cites a number of our prior decisions to support the proposition that, in scenarios like the one here, we do not require that a defendant have submitted or complied with police commands to conclude that a seizure occurred.  The government counters that submission to an officer's show of authority is required for a seizure to occur.  Here, because Mr. Grant never submitted to Officer Amarant-West's requests, as demonstrated by his failure to stop walking and his discarding of the satchel, the government argues that he was not seized within the meaning of the Fourth Amendment until later.  We agree with the government.

#### 1.    *Police Did Not Seize Mr. Grant Until They Arrested Him*

The repeated requests by the police that Mr. Grant stop and show them his bag constituted a sustained show of authority, but this show of authority did not

result in Mr. Grant's seizure because he did not submit to the police. Mr. Grant was not actually seized until after he discarded the satchel containing the gun, at which point officers had probable cause to arrest him.

A police show of authority may be demonstrated by several factors, including, as relevant here, an officer's accusatory questions, continued pressing of the defendant with similar demands or questions when unsatisfied with their answers, and use of language or tone of voice indicating that compliance with the officer's requests is required. *See Carter v. United States*, 341 A.3d 1067, 1071 (D.C. 2025). Such a show of authority, however, cannot amount to a seizure where a defendant does not comply or submit to the officer's requests. *Brendlin*, 551 U.S. at 254; *Hodari D.*, 499 U.S. at 626. On the contrary, there must be an "actual submission" to that show of authority by a defendant for there to be a seizure. *Brendlin*, 551 U.S. at 254; *Golden*, 248 A.3d at 935. Although Officer Amarant-West engaged in a show of authority that may have hindered Mr. Grant's liberty in some way, *see Torres*, 592 U.S. at 311, nothing in the record supports the conclusion that Mr. Grant submitted to that show of police authority before officers found the gun in his satchel.

The interaction between Mr. Grant and Officer Amarant-West before Mr. Grant threw his satchel lasted less than a minute. As Officer Amarant-West

approached the group, Mr. Grant turned, opened his jacket, lifted his shirt to show his waistband, and, without being asked, told the officer that he did not have a gun. Officer Amarant-West responded with a potentially accusatory question: "What about in the satchel you got?" While denying that it contained anything other than "weed," Mr. Grant moved the satchel from his front right hip area to his lower back, underneath his jacket, and continued walking down the sidewalk. This movement prompted a more aggressive response from Officer Amarant-West, who asked Mr. Grant why he turned "like that" and to "show [him] the satchel, then." Officer Amarant-West repeated these same questions as he continued to follow Mr. Grant down the sidewalk.

This marks a turning point in the interaction. Officer Amarant-West was no longer simply "ask[ing] [Mr. Grant] a few questions." *Bostick*, 501 U.S. at 434. Instead, he conveyed through his repeated requests to see Mr. Grant's satchel and accusatory questions about Mr. Grant's movement that he would "not allow [Mr. Grant] to terminate the inquiry and depart before satisfying [his] concerns." *Golden*, 248 A.3d at 935-36.

Officer Amarant-West's show of authority continued as the two men continued down the sidewalk. He appears to tap Mr. Grant on the arm and repeats "why'd you just do it like that?" In response, Mr. Grant turned toward Officer

Amarant-West and again denied having anything in his satchel. Mr. Grant then continued walking down the sidewalk and Officer Amarant-West followed while shining his flashlight on him. Unprompted, Mr. Grant again denied having anything in his satchel. At the same time, he moved the satchel again, shifting it to his right hand. Upon seeing this, Officer Amarant-West engaged in one final show of authority and told Mr. Grant to "hold on" and "hold on for a second." *See Hooks v. United States*, 208 A.3d 741, 745-46 (D.C. 2019) (concluding that an officer's "use of language or tone of voice indicating that compliance with the officer's request might be compelled" may be indicative of a seizure). Mr. Grant, however, did not "hold on"; instead, he said, "I'm throwing it," and he threw the satchel over a fence into a nearby grassy area. He then walked, and ultimately ran, away.

Given Officer Amarant-West's repeated requests to see his satchel, explain his movements, and "hold on," it is clear to us that Mr. Grant was a target of police interest and the subject of a police show of authority. *See Carter*, 341 A.3d at 1071; *Golden*, 248 A.3d at 935-36. For this show of authority to effect a seizure, however, Mr. Grant needed to submit. *Golden*, 248 A.3d at 938; *see Hodari D.*, 499 U.S. at 626. Mr. Grant did not submit.

*Pridgen v. United States*, 134 A.3d 297 (D.C. 2016), helps illustrate this point. There, police officers chased the defendant into an apartment building and drew their

guns because they suspected that he was reaching for a weapon in his jacket. *Id.* at 299. The officers simultaneously ordered the defendant to "stop, get on the ground," a command he ignored. *Id.* An officer then grabbed the defendant and forced him to ground where he was handcuffed. *Id.* We held that the defendant "was seized only when one of the officers grabbed him and the officers took him to the ground." *Id.* at 302. Despite the officers pointing their guns at the defendant and ordering him to stop, we concluded that the defendant was not seized because he "did not comply" and "ignored the officers' requests." *Id.*; *see also Plummer v. United States*, 983 A.2d 323, 333-34 (D.C. 2009) (holding that the defendant was not seized when police officers approached him with their guns drawn and ordered him to show his hands, because he did not comply with their show of authority).

Like the defendants in *Pridgen* and *Plummer*, Mr. Grant did not comply with Officer Amarant-West's requests to show him the satchel, explain why he moved the satchel behind his back, or "hold on" before throwing the satchel. *See Pridgen*, 134 A.3d at 302; *Plummer*, 983 A.2d at 334. Mr. Grant engaged with Officer Amarant-West and demonstrated an understanding of the officer's requests, as shown by his repeated denials of having anything in his satchel. At no point, however, did he show Officer Amarant-West the satchel or explain why he appeared to be trying to keep it from the officer's view. Mr. Grant's throwing of the satchel past Officer Amarant-West's head and over a fence does not "manifest compliance"

with Officer Amarant-West's requests.  *See Plummer*, 983 A.2d at 331 (quoting *United States v. Waterman*, 569 F.3d 144, 146 n.3 (3d Cir. 2009)); *see also Dalton v. United States*, 58 A.3d 1005, 1012-13 (D.C. 2013) (concluding that the defendant was not seized "within the meaning of the Fourth Amendment" when officers pursued him, because he continued to flee, which "demonstrate[d] that he had not submitted to their show of authority").

Because Mr. Grant did not comply with Officer Amarant-West's requests, "he did not submit to authority and was not seized." *Id.* at 334; *Brendlin*, 551 U.S. at 254; *Hodari D.*, 499 U.S. at 626.  Consequently, we conclude that there was no seizure within the meaning of Fourth Amendment during Mr. Grant's initial encounter, which ended when he fled from police.[2]

---

[2] By the time Mr. Grant was later arrested, and therefore indisputably seized, officers had found the gun and extended magazine in his discarded satchel, giving them probable cause to arrest him. *See Zanders v. United States*, 75 A.3d 244, 249 (D.C. 2013) (holding that the discovery of a gun "gave the police probable cause to arrest" the defendants); *Gamble v. United States*, 901 A.2d 159, 167 (D.C. 2006) ("Once [police] found a gun in appellant's pocket, they had probable cause to arrest him."); *Bsharah v. United States*, 646 A.2d 993, 996 (D.C. 1994) ("We have held on several occasions that a police officer who has reliable knowledge that a person is in possession of a handgun has probable cause to arrest that person for the crime of carrying a pistol without a license (CPWL).").

### 2. Mr. Grant's Counterarguments Are Unavailing

Mr. Grant makes two main points in support of his argument that he was seized by Officer Amarant-West before discarding his satchel: first, that he was seized when he "briefly stopped" to speak with police in response to what he claims was an instruction by Officer Amarant-West to "hold it here," and second, that the numerous shows of authority by Officer Amarant-West amounted to a seizure even if he failed to submit or comply with the officer's demands. We are unpersuaded.[3]

Mr. Grant's first argument falls short. The trial court found that, throughout the encounter with Officer Amarant-West, Mr. Grant "continued to walk and began running after he threw the satchel." Our review of the record does not show that this finding was "clearly erroneous." *Mayo*, 315 A.3d at 616. Officer Amarant-West testified that whenever the group stopped to talk or engage with him "they were still slightly moving." The officers' BWC footage supports this testimony. Although Mr. Grant slowed down when Officer Amarant-West asked him, "why you'd just do it like that," the other officer's BWC footage shows that Mr. Grant was continuously moving, albeit slowly, throughout this part of the interaction.

---

[3] Mr. Grant also argues that the trial court initially found that he was subject to a *Terry* stop before concluding later that he was never seized, and that we should adopt the trial court's initial finding. But we review legal issues regarding a motion to suppress, like whether a seizure occurred, de novo. *Mayo*, 315 A.3d at 616.

Further undermining Mr. Grant's argument is that the content of the alleged "hold it here" comment is hard to decipher from the BWC footage and does not appear to be directed at Mr. Grant's group. The BWC footage from Officer Amarant-West and the officer assisting him shows that Officer Amarant-West's comment was likely directed at his fellow police officer rather than at Mr. Grant or his group. For example, in Officer Amarant-West's BWC footage, he can be seen turning his body to the side, away from Mr. Grant's group, and speaking in a noticeably quieter voice compared to when he called "hey, yo" to get the attention of the group moments earlier. The assisting officer's BWC footage confirms that Officer Amarant-West turned his head away from Mr. Grant's group when making the comment, suggesting that it was directed toward his fellow officer.

The indecipherable nature of Officer Amarant-West's comment also cuts against Mr. Grant. It is true that in Officer Amarant-West's BWC footage it sounds something like "hold this here." In the other officer's BWC footage, however, it sounds like Officer Amarant-West says "call this in," an interpretation that is supported by the fact that the other officer immediately used his radio to report their location and that they were "making contact with about four individuals." At the suppression hearing, Officer Amarant-West denied ordering the group to stop when he was attempting to get their attention. And, again, Mr. Grant did not in fact "hold it here." In short, it appears more likely that the comment Mr. Grant relies on was

not directed at him and not the command to stop that he claims. We therefore cannot conclude, based on the record, that the trial court's finding that Mr. Grant did not stop was "clearly erroneous." *Mayo*, 315 A.3d at 616.

Mr. Grant's second contention is that Officer Amarant-West's shows of authority amounted to a seizure even if Mr. Grant did not submit to them. As part of this argument, Mr. Grant relies chiefly on our decisions in *Golden*, *Dozier*, *Carter*, and *Mayo*. Those cases, however, are distinguishable.

It is true that in *Golden*, *Dozier*, and *Carter* we held that seizures had occurred based on shows of authority by police. *See Golden*, 248 A.3d at 937-38; *Dozier v. United States*, 220 A.3d 933, 947 (D.C. 2019); *Carter*, 341 A.3d at 1080. The critical difference is that the defendants in those cases submitted to the police show of authority. *See Golden*, 248 A.3d at 938 ("As we have said, a show of authority by the police does not effect a seizure unless the suspect submits. Mr. Golden did submit."); *Dozier*, 341 A.3d at 947 ("[W]e conclude that appellant was seized within the meaning of the Fourth Amendment by the time he complied with the officers' request to put his hands on the alley wall so that they could pat him down."); *Carter*, 341 A.3d at 1070 ("Unsatisfied, Officer DelBorrell requested, '[d]o you mind hiking your pants for me real quick?' Mr. Carter complied."). Put another way, the defendant's actual submission in the face of a show of authority is what effectuated

the seizure.  *See Golden*, 248 A.3d at 938; *Dozier*, 341 A.3d. at 941, 947; *Carter*, 341 A.3d at 1070, 1080.  Although there were shows of authority by the police in this case that, had Mr. Grant complied, likely would alter our Fourth Amendment analysis, the record shows that Mr. Grant did not submit.  This failure to submit is a critical distinction that fatally undermines his assertion that a seizure occurred before his arrest.  *See Brendlin*, 551 U.S. at 254; *Hodari D.*, 499 U.S. at 626; *Pope*, 313 A.3d at 572.

Mr. Grant's argument appears even weaker when we consider cases like *Pridgen* and *Plummer*, where we concluded that the defendants were not seized even though police officers gave direct orders and drew their guns—including, in *Pridgen*, pointing their guns at Mr. Pridgen.  *Pridgen*, 134 A.3d at 302; *Plummer*, 983 A.2d at 333-34.  Notwithstanding these forceful shows of authority by police, we maintained that, because the defendants did not submit, no seizure occurred within the meaning of the Fourth Amendment.  *Pridgen*, 134 A.3d at 302; *Plummer*, 983 A.2d at 333-34.  Considering that there is no evidence that officers drew or even reached for their guns during their initial interaction with Mr. Grant, we have no difficulty concluding that a seizure did not occur when Mr. Grant did not submit to the far less imposing shows of authority present here.

Mr. Grant's reliance on *Mayo* is similarly misplaced. He asserts that *Mayo* illustrates that a suspect's flight does not preclude this court from finding that a seizure occurred prior to the suspect fleeing. We fail to see how *Mayo* supports Mr. Grant's position. In *Mayo*, we held that the police seized the defendant when attempting to tackle him, which resulted in an officer briefly grabbing his foot before he broke free and kept running. *Mayo*, 315 A.3d at 619. Although the tackling officer's attempt to physically restrain the defendant was unsuccessful, we concluded, based on *Torres*, that the officer's touching of the defendant's foot amounted to a seizure by physical force. *Id.* (citing *Torres*, 592 U.S. at 325). While we held that the officers' coercive behavior prior to the seizure reduced the weight that the defendant's flight had in our reasonable suspicion analysis, *id.* at 632, it had no impact on the seizure analysis, *see id.* at 619. Given the different type of seizure at issue in *Mayo*, our decision there offers no support for Mr. Grant's argument that we must resolve the fact that he did not submit to a police show of authority in favor of finding that a seizure occurred here.

As we conclude that the police did not seize Mr. Grant prior to his arrest, we decline to consider whether officers had a reasonable articulable suspicion for a seizure when they engaged with Mr. Grant prior to his flight. *See Ware v. United States*, 672 A.2d 557, 560 (D.C. 1996) (explaining that reasonable suspicion analysis is only necessary if we first conclude that a defendant was seized within the meaning

of the Fourth Amendment (citing *Hawkins v. United States*, 663 A.2d 1221, 1225 (D.C. 1995)).

"Evidence collected in violation of the Fourth Amendment is considered fruit of the poisonous tree and generally may not be used by the government to prove a defendant's guilt." *Pope*, 313 A.3d at 572 (citation modified). Because Mr. Grant did not comply with Officer Amarant-West's shows of authority and was therefore not seized within the meaning of the Fourth Amendment until he was physically arrested later, we hold that the gun and ammunition he abandoned when he threw the satchel were not the fruits of a seizure. *Hodari D.*, 499 U.S. at 629 (concluding that the cocaine the defendant abandoned prior to being seized was not the fruit of a seizure). Consequently, the trial court properly denied his motion to suppress that evidence. *See id.*

### III.    Conclusion

For the foregoing reasons, we affirm the trial court's order denying Mr. Grant's motion to suppress.

*So ordered*.